COURT OF APPEALS OF VIRGINIA

Present:   Judges Chafin, Russell and AtLee
Argued at Richmond, Virginia

PUBLISHED

JOCELYN LEE GEOUGE

v.      Record No. 0559-17-2

JASON BARRY TRAYLOR, DUSTIN GRIFFITH
  AND TIFFANY VADELLA-GRIFFITH

JOCELYN LEE GEOUGE

v.      Record No. 0737-17-2

JASON BARRY TRAYLOR, DUSTIN GRIFFITH
  AND TIFFANY VADELLA-GRIFFITH

OPINION BY
JUDGE WESLEY G. RUSSELL, JR.
DECEMBER 27, 2017

FROM THE CIRCUIT COURT OF POWHATAN COUNTY
Paul W. Cella, Judge

Anne L. Roddy (FloranceGordonBrown, on brief), for appellant.

Colleen M. Quinn (Kati K. Dean; Rick Friedman; M. Brooke Teefey,
Guardian *ad litem* for the minor child; Locke & Quinn, PLC;
Friedman Law Firm, P.C., on brief), for appellees.

In this consolidated appeal, Jocelyn Lee Geouge, biological mother of L.T., challenges two

orders of the Powhatan County Circuit Court relating to the placement of L.T. by the child's

biological father, Jason Traylor, with Dustin and Tiffany Griffith ("appellees")[1] for their adoption of

L.T.  Geouge contends the first order erred in ruling, among other things, that the Indian Child

Welfare Act ("ICWA" or "the Act") did not apply to the proceedings, that Geouge withheld her

consent to the placement and adoption of L.T. contrary to the child's best interests, and that legal

---

[1] The biological father, Traylor, also is an "appellee" in this case; however, for purposes
of this opinion, we limit the use of the term "appellees" to refer only to the adoptive parents
unless context dictates otherwise.

and physical custody of L.T. would be granted to appellees. Geouge further appeals the subsequent final order of adoption granting appellees' petition for adoption of L.T. For the reasons that follow, we affirm.

BACKGROUND

Because the circuit court heard evidence *ore tenus*, its factual findings are "entitled to the same weight accorded a jury verdict[] and . . . will not be disturbed on appeal unless plainly wrong or without evidence to support" them. Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 44, 764 S.E.2d 284, 289 (2014) (internal quotation marks and citation omitted). Moreover, we review the facts in the light most favorable to appellees, granting them all reasonable inferences that can be drawn from the evidence, because they were the prevailing parties below. See Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). Thus, we must disregard any evidence that conflicts with appellees' evidence. See Garst v. Obenchain, 196 Va. 664, 668, 85 S.E.2d 207, 210 (1955).

So viewed, the evidence establishes that Geouge is the biological mother of L.T., the child who is the subject of this appeal, and four older children, three of whom she shares with Traylor. Geouge was convicted of prescription fraud in late 2013, resulting in a three-year suspended sentence. In March 2014, Geouge again was convicted of prescription fraud. Geouge was sentenced to five years incarceration in the Department of Corrections, with all five years suspended for ten years, conditioned on good behavior. Geouge subsequently was convicted of breaking and entering, several counts of larceny, and illegal possession of drugs, and in February 2015, was sentenced to a total of ten years and sixty months, but the sentencing court suspended all but one year and three months and granted credit for time served. On February 18, 2015, the corrections medical unit informed Geouge was pregnant.

After her release, in June 2015, Geouge was convicted of obtaining drugs using a false name and identify theft to defraud. The court imposed a prison sentence, but suspended all but six months of that sentence.

Based on these convictions, in June 2015, Geouge was found to be in violation of the terms of her suspended sentences. The sentencing court imposed portions of the suspended sentences associated with her prior convictions, but resuspended all but six months of the sentences. In light of her high-risk pregnancy, Geouge was placed on house arrest in July 2015, but she failed a drug screen in September and was reincarcerated, with a release date set for late January 2017.

On October 17, 2015, while serving her sentence, Geouge gave birth to L.T. Although the Fluvanna Department of Social Services ("DSS" or "the Department") had tried to work with Geouge to find an appropriate placement prior to L.T.'s birth, when L.T. was discharged from the hospital on October 20, 2015, she had no placement. As a result, L.T. was temporarily entrusted to the Department, who then placed her in a foster home. On October 23, 2015, Traylor informed the Department that he was willing to take the child and raise her with her brothers; he relayed plans that he had made, including his purchases of infant supplies. Because Traylor lived in Powhatan County, the case was transferred to its DSS. Powhatan DSS performed a background check, and, on October 28, 2015, L.T. was released to Traylor. The same day, Traylor unilaterally transferred physical custody of L.T. to appellees.

On October 29, 2015, Powhatan DSS conducted a family partnership meeting to assist the family in identifying needs and services. Traylor was present, and Geouge participated via telephone. Geouge's aunt and grandmother and social workers from Powhatan and Fluvanna DSS and the Department of Corrections also participated. Geouge's addiction to pain medications was discussed. Despite appellees already having physical custody of L.T., Traylor represented that the prior night with L.T. had gone well and noted the availability of his family support system going

forward. An action plan was adopted by which L.T. was to remain with Traylor, who was to remain in contact with Geouge, and visitation with Geouge was to be considered once L.T. had been issued a social security number.

On November 2, 2015, Powhatan DSS performed a follow-up visit at Traylor's home to ascertain what services, if any, he might need. L.T. was not at the home; Traylor indicated that she was temporarily at a friend's house to allow him to sort out issues with the other children before she returned to the home. Traylor declined any services.

Later in November 2015, Traylor, joined by appellees, filed in the Powhatan County Juvenile and Domestic Relations District Court ("JDR court") a "Petition to Accept Consent for Adoption and Transfer Custody" whereby he requested the court to accept his consent for adoption, "accept the consent of [birth mother] or otherwise address her parental rights[,] and transfer custody of [L.T.] to the [adoptive parents, appellees,] to be responsible for the care of the child until such time as . . . the Final Order of Adoption is entered."

On December 4, 2015, Geouge, *pro se*, filed a petition in the JDR court requesting that custody of L.T. be transferred to Geouge's mother or cousin. She further petitioned the court for visitation with her child. On the petitions, Geouge noted L.T.'s race as "Caucasian/Native American." L.T.'s maternal grandmother also filed a petition for visitation. Because Geouge was incarcerated, a guardian *ad litem* was appointed to represent her.[2] A separate guardian was appointed to represent L.T.'s interests.

On January 27, 2016, the JDR court heard Geouge's petition for legal custody and visitation of L.T. Geouge sought weekly visitation to occur at the prison. By order dated March 9, 2016, the JDR court denied the petition. This order was not appealed.

---

[2] After Geouge was released from prison, the guardian *ad litem* ceased being her guardian, but continued to represent her as her counsel.

On March 18, 2016, appellees filed in the JDR court a petition for custody and visitation of L.T. On May 16, 2016, Geouge filed a motion to dismiss appellees' petition for custody, asserting that appellees lacked standing and already had custody.

The JDR court conducted a hearing on June 1, 2016, and entered its order on July 6, 2016. The JDR court denied Geouge's motion to dismiss, found that the ICWA and the Servicemembers Civil Relief Act did not apply,[3] and accepted Traylor's consent. The JDR court further found that Geouge was objecting to the adoption contrary to L.T.'s best interests and waived the requirement that she consent. The court awarded custody of the child to appellees, "pursuant to their [p]etitions filed under Virginia Code [§] 63.2-1230, et seq."

On July 13, 2016, Geouge appealed the JDR court's ruling to the circuit court for a trial *de novo*. Trial was set for December 15, 2016, but by motion filed September 27, 2016, Geouge sought to continue the matter until after her release from prison in January, "so that she may fully participate in her opposition to the petition." Appellees objected to a continuance, and a hearing on the motion was held on November 8, 2016. Geouge enumerated several ways in which her life circumstances would be changed upon her release from incarceration, including procurement of a driver's license, securing of housing, access to assets, and greater ability to find employment. In denying the motion, the court noted from the bench that Geouge "can present evidence of what her plan is when she gets out, and I can hear that and make a decision based on that. . . . I don't think this case can be dragged on indefinitely to see how [Geouge] does." By order dated the same day, the circuit court denied Geouge's motion to continue. On December 6, 2016, Geouge filed another motion to continue based on appellees' alleged failure to comply with discovery rules; the motion was withdrawn upon the parties reaching an agreement on the discovery issues.

---

[3] It does not appear that the parties raised either the ICWA or the Servicemembers Civil Release Act in the JDR court; rather, the findings of inapplicability appear to be part of the JDR court's standard order.

On December 12, 2016, Geouge filed a motion to stay the proceedings, claiming that Geouge's father was of Native American descent. She asserted that a stay was needed "to ensure compliance with the [Indian Child Welfare Act], if it applies" to allow for "sufficient time for appropriate Notice to the Tribes, as well as sufficient time for mother to investigate her ancestry to determine [her] status." Appellees opposed the stay.

The matter proceeded to trial in the circuit court on December 15, 2016. At the outset of trial, Geouge raised the issue of the potential application of ICWA, asserting that Geouge's father was "known by the family to be of Cherokee descent," but making no representation that either he or Geouge were members of a federally recognized Cherokee tribe. Dorothy Wilkins, who had shared a home with Geouge's father when they were growing up, later testified that the family believed that he was of Native American descent. Geouge's aunt, her father's sister, also testified that she understood from her parents that they were of Cherokee descent. Without objection, appellees provided the court with a copy of the Federal Register listing the three federally recognized Cherokee tribes and information regarding the requirements for membership in those tribes. The child's guardian *ad litem* concurred with Geouge's request for a continuance/stay, citing the potential for an overturning of the adoption in the future should a tribe determine the child is a member.

In denying the stay, the circuit court determined that under ICWA, "the child must be a member of a federally recognized tribe, or the child must be eligible for membership and be the child of a member." The court then found that Geouge had "conceded that those requirements have not been met, because there's not proof that the child is a member or that the mother is a member." The court noted that "[i]t's just some vague assertion that there might be some Indian ancestry" and stated that "the burden of proof is on [Geouge] to show that ICWA does apply."

After denying the stay, the court proceeded to address whether Geouge was withholding her consent to the adoption contrary to the best interests of L.T. The parties presented evidence over two days.

Appellee Mrs. Griffith testified that she became aware of L.T. through her pastor. She noted that L.T. was eleven days old when she and her husband assumed custody of her, but that Traylor did not formally consent to the adoption until seven to ten days later. She denied making any payments to Traylor. She stated Geouge first attempted to call appellees in December 2015, but they were out of town. Geouge next reached out in January 2016, and again in April 2016, having about a twenty-minute phone conversation each time. Mrs. Griffith also testified regarding written correspondence, including her sending Geouge photographs of L.T. in March 2016. More pictures and an update were sent in November just after L.T.'s first birthday. With respect to bringing L.T. to the correctional facility to visit Geouge, Mrs. Griffith asserted her belief that the JDR court order denying Geouge's visitation petition prohibited such visitation.

Mrs. Griffith testified about taking L.T. to regular doctors' appointments and commented that the child is "a very happy and healthy baby." She further described their usual activities, including playing cook, reading, taking walks, and occasional play dates. She also commented on the efforts she had made to allow interaction with Geouge's mother and to foster a continuing relationship between L.T., Traylor, and L.T.'s brothers. Citing consideration of the best interests of L.T., she neither agreed to nor ruled out potential interaction between L.T. and Geouge in the future.

Traylor testified that he began his relationship with Geouge in 2006 and had custody of three sons that he shares with Geouge. He stated that he initially had planned on parenting L.T., but realized he would not be capable when also raising the other children. He noted behavioral issues with them, especially the eldest who had been admitted to a psychiatric facility.

Traylor lived with Geouge until she was incarcerated. He testified to observing fentanyl patches, empty pill capsules, and liquor at the residence. He commented on the condition of Geouge's mother's house when they resided there, noting that it had rotted wood, missing bricks, and mold. He acknowledged that he could not say whether there had been improvements made after he moved out.

Traylor described incidents of rage by Geouge, in which she yelled, swore, spat, and threw things, even when children were present. He stated that she once hit him in the back of his head with a skateboard and that "she did come after me with a knife on a few occasions." Traylor also asserted that Geouge inappropriately consumed cough syrup and had pawned some of the children's toys.

Jeremiah Geouge, Geouge's ex-husband, also testified. They married in 1998 and separated five to six years later. They divorced in 2014 while Geouge was incarcerated. Together they had a son, born March 27, 2001, who is autistic. Geouge had custody of the son until July 2014 when custody was transferred to the ex-husband. Geouge was awarded visitation. According to the ex-husband, Geouge attempted to maintain regular communication with their son. The ex-husband testified that, minus some violent episodes, he thought Geouge was a good parent.

Appellees called several witnesses to testify to their observations of Geouge's drug use and parenting. Katie Bredemeier, a friend through Geouge's ex-husband, testified to Geouge's attempt to use her name to procure oxycodone and Geouge's unlawful acquisition of her daughter's drugs. Bredemeier testified that prior to her drug problem, which began in 2013-14, Geouge took good care of her sons. Bredemeier said she had been approached about taking care of L.T., but was only interested if it would lead to full adoption.

Lori Guthrie, who had known Geouge for sixteen years, acknowledged that she had given Geouge prescription drugs in the past. She relayed an incident regarding a neighbor whose

daughter's medications went missing after Geouge had used the bathroom. Guthrie had been asked to take L.T., but could not due to her own family issues.

Traylor's mother, Teresa Traylor, recounted calling the police when Geouge used her name to get prescription drugs from a dentist. She stated that Geouge started as a good mother, but then "things started happening." As the paternal grandmother, she assumed a lot of financial responsibility regarding the three boys. She commented that Geouge was "not a good parent for these children."

Geouge called numerous witnesses to opine on her positive qualities as a parent. The witnesses included relatives and others in the community. They testified regarding their impressions of her relationships with her other children, her attempts at reforming her troublesome behaviors, and their abilities to serve as a support system for Geouge and her children upon her release from prison.

Geouge also called multiple officials from the prison to testify. They testified that Geouge was behaving appropriately in prison, seemed eager to correct her past mistakes, expressed her desire to reunite with L.T., was working towards sobriety, and recognized that her actions had led to her current family situation. They testified that Geouge sought out classes, including a parenting class, designed to ease her transition after her release from prison.

Geouge testified regarding her drug addiction. She said she became addicted to pain medication after a series of back surgeries beginning in 2011. She denied using any substances while pregnant with any of her children and contested the allegations made during Traylor's testimony regarding same. She described the programs she was participating in and detailed what actions she would take upon release, including checking in with her probation officer, continued substance abuse treatment programs, and further payment of her fines and costs. She explained what repairs had been and would be made to the house in which she and the children would live.

She articulated how she anticipated the transition for L.T. would proceed, allowing the child to remain with appellees with gradually more time with Geouge, possibly over the course of a year. Geouge acknowledged she had not seen her child since three days after she had been born. On cross-examination, she was questioned regarding outstanding medical bills, of which she had no knowledge, and her potential future employment for which she had not yet applied.

Dr. William F. Whelan, a clinical psychologist, testified as an expert in attachment issues. He described his methodology and explained the importance to a child of strong, healthy parental attachment. He observed L.T. with appellees in April and in October of 2016. He testified that L.T.'s attachment with appellees was secure and healthy and that there were no high risk or odd behaviors or developmental problems. He specifically opined that

> [L.T.'s] interactions in October when we saw them are secure with each [foster] parent, meaning that she does organize herself around them, she automatically makes good use of their help both for exploration and for soothing her distress and her emotions. She automatically gravitates toward them, seeks proximity, maintains contact with them during times of stress. And these are all things that are hallmarks of security in the first year of life.

With respect to appellees, he commented,

> Their caregiving patterns . . . were sensitive to her emotional and behavioral needs, and secure. They were able to scaffold her behavior and exploration in the play room, and during times of distress they did a very nice job in approaching and soothing her, and she responded well to that. So there was a large degree of automatic, moment-to-moment synchronicity in their behaviors and also reciprocity, and those things are also hallmarks of security.

Dr. Whelan also testified to the potential effects of a change in custody. He stated:

> If [L.T.] were to lose her current foster parents, that would almost certainly be a huge loss to her and a huge injury, emotional injury. One of the reasons being is that the relationship is a very physical thing . . . her body, her neurology is used to having them around, knows how to interact with them, and she's organized herself around those people. So if she loses them she's going to sustain a very significant emotional loss and injury.

- 10 -

He noted that, as a result of such a separation, a child may suffer physical symptoms as well, including vomiting or sleep loss, and, if under protracted distress, loss of concentration and behavioral issues.

Although he testified that it was his opinion that L.T. was fully attached to appellees, Dr. Whelan conceded that it is possible for a child, after suffering a traumatic loss of attachment, to develop healthy, secure attachments with other caregivers. The new caregiver, however, would need to be a person who

> is emotionally healthy and has good abilities in self-reflection, able to think about what's going on inside [L.T.], able to think about what she needs, able to think about her own emotional states and be able to regulate herself well. [The new caregiver would need to be a] person who has a history of success in close emotional relationships, somebody that knows how to repair ups and downs . . . .

Dr. Whelan had not met with Geouge or assessed her caregiving abilities, but opined that a history of addiction or inability to regulate internal behaviors would raise concerns.

Rev. Walter Lewis, the priest at the church where appellees have been parishioners for over five years, and Mary Harrison, a fellow parishioner, reported the positive interactions between L.T. and appellees that they had observed.

After the close of all the evidence, the parties made extensive closing arguments relating to their views as to the best interests of L.T. Once argument was concluded, the court commented that "this is a difficult case in several respects," "somebody is going to be hurt bad no matter what I do," and "this child is going to have a hard time because of the history no matter what." The court continued, "the question is under Code § 63.2-1205 whether the valid consent of the mother is being withheld contrary to the best interest of the child in light of the factors outlined in that Code section." The court then addressed the statutory factors.

With respect to the first factor, Geouge's efforts to obtain or maintain legal and physical custody, the court stated, "[Geouge] kind of sabotaged her own efforts by getting herself back into

prison when she was on house arrest. . . . That was her fault." The court noted that "she has made

some efforts to maintain custody since she got back into prison, understanding the difficulties

inherent in that, but she put herself in [that] position."

Regarding the second factor, the parent's willingness and ability to assume full custody, the

court acknowledged Geouge's clear willingness, but questioned not only her ability while

incarcerated, but also after release. The court stated, "we're left to conjecture as to what might

happen in the future . . . [w]e've got a history of incarceration and drug addiction and criminal

activity which I have to weigh and the future is an unknown."

As to the third factor, the court commented: "The thwarting by [father] troubles me a great

deal and I think that is a factor in the mother's favor. I think the fact that he just gave the child away

and essentially thought that he could do whatever he wanted to when she was in jail bothers me."

The court made no comments regarding any thwarting on the part of appellees.

The court continued:

> The next factor is the birth parents' ability to care for the
> child, and I think that is an[] unknown at this point, and I don't think
> it's been proved she has the ability at the moment. The age of the
> child is 14 months as has been pointed out.
>
> The next factor is the quality of any previous relationship
> between the mother and the child and between the mother and any
> other children. She has essentially zero relationship with this child.
> And . . . the relationship with the other children is unsatisfactory at
> the moment . . . .

The court then considered the duration and suitability of L.T.'s present custodial environment,

noting that everyone seemed to agree that it was "excellent."

Finally, the court addressed the effect of a change in physical custody. In considering this

factor, the court gave significant weight to the testimony of Dr. Whelan. The court summarized the

evidence as follows:

He testified that there is a wound or an injury that is created. In my notes he said a, quote, "huge loss" closed quote, and, quote, "emotional injury," closed quote, and that they could heal depending on the qualities of the new caretaker, and unfortunately the mother fits the qualities he outlined as being unsatisfactory to be a caretaker.

After reviewing all of the factors in light of the evidence presented, the court stated its ruling from the bench on December 16, 2016. The court determined that Geouge was withholding her consent contrary to the best interests of the child and that the adoption should go forward. No order memorializing the ruling was entered for several months.

On March 9, 2017, Geouge filed a motion asking the circuit court to reconsider its December 16, 2016 ruling. In support of her motion, she asserted, among other things, that she was no longer incarcerated, had paid all outstanding court fines and costs, had inherited substantial sums, and had use of a car. Geouge also contended that the circuit court had not correctly applied the ICWA.

On March 10, 2017, the court issued a letter opinion detailing its reasons for denying the motion to reconsider and entered its final order memorializing its rulings. The order expressly denied Geouge's motion to stay, holding that the ICWA did not apply; denied the motion to continue; accepted Traylor's consent pursuant to Code § 63.2-1233; waived Geouge's consent, finding that she withheld it contrary to L.T.'s best interests; and granted appellees legal and physical custody of the child. Geouge filed her notice of appeal of this order with the circuit court on April 7, 2017.

Appellees filed a petition for adoption of L.T. on March 20, 2017. Attached to the petition were Traylor's attested consent to adoption, home study reports, and the March 10, 2017 circuit court order waiving the requirement of Geouge's consent. The same day, based on the petition, the court entered an interlocutory order, by which the birth parents' parental rights were terminated. The order noted that father had consented to the adoption, that Geouge's consent had been withheld

- 13 -

contrary to the best interests of the child, and that the best interests of the child would be promoted by her adoption. Upon receipt and review of a post-placement home visit report, the circuit court granted appellees' petition, finding that "all requirements of the applicable statutes have been complied with[.]" By order dated April 14, 2017, L.T. was decreed to be the child of appellees, her name was changed, and Traylor was awarded visitation.

On May 10, 2017, twenty-five days after entry of the adoption order, Geouge filed her objections to the order with the court. In addition to reiterating her objections to the March 10, 2017 order, Geouge asserted the court erred in awarding the adoption without her being served with or receiving notice of the petition and in entering the order while the consent issue addressed in the March 10, 2017 order was on appeal to this Court. Geouge noted her appeal of the April 14, 2017 order to this Court the same day.

With respect to the December 16, 2016 order specifically, Geouge presents the following assignments of error:

> 1. The [t]rial [c]ourt erred in failing to establish jurisdiction, and in failing to determine that [a]ppellees had complied with the Indian Child Welfare Act, when there was reason to believe that the minor child was an Indian Child.
>
> 2. The [t]rial [c]ourt erred in determining that [Geouge] was withholding consent to the adoption of her daughter L.T. contrary to the best interests of her child. The [t]rial [c]ourt erred in failing to consider the evidence pursuant to Virginia Code Section 63.2-1205.
>
> 3. The [t]rial [c]ourt erred in failing to consider the actions of the [a]ppellees in withholding L.T. and thwarting a relationship with [Geouge], pursuant to Virginia Code Section 63.2-1205, and abused its discretion in failing to give such evidence sufficient weight in consideration of factor three of Virginia Code Section 63.2-1205.
>
> 4. The [t]rial [c]ourt erred in determining that a visitation order between [Geouge and father] was a binding order prohibiting actions of the prospective Appellees.
>
> 5. The [t]rial [c]ourt erred by failing to grant [Geouge's] Motion to Continue the Trial of December 2016 out to a time certain after

Geouge's release from prison, January 2017, and compounded such abuse of discretion by failing to grant Geouge's Motion to Reconsider in March of 2017.

Geouge raises the following as an additional assignment of error regarding the April 14, 2017 order of adoption:

The Trial Court erred in granting the Adoption Petition without consideration of the factors in Virginia Code Section 63.2-1205, and in failing to provide Notice of Petition for Adoption to [Geouge], or inquire as to counsel representation prior to ruling on the Adoption Petition, as required in Virginia Code Section 63.2-1203.

ANALYSIS

I. Applicability of the Indian Child Welfare Act

In 1978, Congress enacted the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq*., to address what it determined was a crisis in which "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4). Pursuant to the Act, it is the policy of the United States

to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902.

To further this policy, the Act "establishes a number of procedural protections for cases involving Indian children." Thompson v. Fairfax Cty. Dep't of Family Servs., 62 Va. App. 350, 363, 747 S.E.2d 838, 845 (2013). Among these protections, the Act provides that "the parent or custodian of the Indian child, as well as the tribe, are entitled to notice by registered mail with

- 15 -

return receipt requested of 'any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved.'" Id. (quoting 25 U.S.C. § 1912(a)). Failure of a state court to ensure that the Act's protections are implemented subjects any action taken by the state court, including an order of adoption, to potential invalidation in a subsequent proceeding. 25 U.S.C. § 1914.

Having Native American ancestry alone, however, does not make one an "Indian child" for purposes of the Act. Rather, the Act specifically defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Moreover, the Act is limited to those Indian tribes that are federally recognized. 25 U.S.C. § 1903(3) & (8); see also In re C.H., 79 P.3d 822, 826 (Mont. 2003). The ultimate determination of whether a child is a member of a recognized tribe or is eligible for membership in a recognized tribe is "solely within the jurisdiction and authority of the Tribe, except as otherwise provided by Federal or Tribal law . . . [and a] State court may not substitute its own determination regarding" these membership questions. 25 C.F.R. § 23.108(b).[4]

---

[4] For the majority of the Act's existence, there have been no federal regulations regarding how it should be implemented. Instead, "[t]he Bureau of Indian Affairs . . . published guidelines for interpreting and applying [the Act], with accompanying commentary, in the Federal Register. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584-95 (Nov. 26, 1979)." Thompson, 62 Va. App. at 365, 747 S.E.2d at 846. "The guidelines [were] 'not published as regulations because they [were] not intended to have binding legislative effect.'" Id. (quoting 44 Fed. Reg. 67,584).

During the pendency of the proceedings below, a final legislative rule that had been subject to notice and comment became effective. See 25 C.F.R. Part 23. Coincidentally, the final rule became effective on December 12, 2016, the same day that Geouge filed her motion to stay proceedings because the Act might apply in the circuit court. Unlike the previously utilized guidelines, the new rule and the regulations it contains are entitled to the force of law. Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" (citation omitted)).

Although there is no dispute that the termination of parental rights and subsequent adoption ultimately at issue in this case is the *type* of involuntary proceeding addressed by the Act, see 25 U.S.C. § 1903(1), there is a dispute as to whether the Act applies to this case. Specifically, Geouge argues that the assertion in her motion to stay proceedings that the Act "might apply" was sufficient to invoke the protections of the Act's notice provisions and required appellees to provide the relevant notices pursuant to 25 U.S.C. § 1912(a).[5] Appellees counter that Geouge, as the party invoking the Act, had the burden to demonstrate the Act's applicability, and thus, was required to prove that L.T. was an "Indian child" as defined in the Act before any portion of the Act would become operative.

As courts around the country have found, whether the Act applies to a given case presents a question of law. See, e.g., State v. Reich-Crabtree (In re M.H.C.), 381 P.3d 710, 712 (Okla. 2016); In re Adoption of T.A.W., 383 P.3d 492, 497 (Wash. 2016); Cherino v. Cherino, 176 P.3d 1184, 1185 (N.M. Ct. App. 2008). Accordingly, we review *de novo* the circuit court's decision that the Act does not apply. See Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96,

---

[5] 25 U.S.C. § 1912(a) provides that, in an adoption proceeding subject to the Act,

> the party seeking the [adoption of] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

104, 639 S.E.2d 174, 178 (2007); Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 406, 719 S.E.2d 329, 344 (2012).

In general, a party invoking the protections of a statute bears the burden of demonstrating that the statute is applicable. Multiple courts addressing the Act have concluded that the party invoking it bears the burden to demonstrate that the case implicates the Act. See, e.g., In re Trever I., 973 A.2d 752, 759 (Me. 2009); People v. Diane N. (in Re C.N.), 752 N.E.2d 1030, 1044 (Ill. 2001); In re A.S., 614 N.W.2d 383, 385-86 (S.D. 2000); In re Interest of J.L.M., 451 N.W.2d 377, 387 (Neb. 1990). We agree with appellees that, ultimately, the party invoking the Act bears the burden of establishing that the Act applies.[6]

Despite this agreement, we disagree with their assertion that the invoking party must "prove" that the child is an "Indian child" before any provisions of the Act are implicated. From the Act's express terms, it is clear that the Act's notice provisions are implicated long before a state court has determined conclusively that a child falls within the Act's definition of an "Indian child."

---

[6] We note that, pursuant to the recently adopted regulations, the Act imposes a duty on state courts to inquire as to whether the Act applies. Specifically, 25 C.F.R. § 23.107(a) requires that a state court

> ask each participant in a[] . . . child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

As noted above, the regulation did not become effective until after the circuit court proceedings already had commenced. Given that the issue first was raised by Geouge on the day the regulations became effective and the circuit court's consideration and ultimate disposition of the issue, we conclude that the circuit court sufficiently satisfied any obligations it had under 25 C.F.R. § 23.107(a).

The Act's notice provisions are triggered when a state court "knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). If, for the notice provisions to become operative a party had to *prove* that a child was an "Indian child," the statutory language would provide only that notice is necessary when the state court "knows that an Indian child is involved." The inclusion of the less certain "reason to know" in addition to the more definitive "knows" is a clear indication that Congress intended the notice provisions to be effective in situations where there was still question as to whether the child is an Indian child.

This view finds additional support from 25 U.S.C. § 1912(a)'s provisions regarding providing notice to the Secretary of the Interior. Among other instances, notice must be given to the Secretary of the Interior when "the identity [of the] tribe cannot be determined." Given that the Act limits the definition of "Indian child" to those who are members of or eligible for membership in federally recognized tribes, 25 U.S.C. § 1903(3), (4) & (8), it is impossible to prove that a child meets the statutory definition of "Indian child" without knowing the identity of the tribe. Accordingly, the notice provisions of the Act clearly are operative in situations where the party invoking the Act has not yet proven that the child is an "Indian child."

The recently adopted regulations implementing the Act also make clear that the "reason to know" standard requires less than actual proof that the child meets the statutory definition of "Indian child." The regulations expressly recognize that state courts will be faced with situations in which "there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an 'Indian child.'" 25 C.F.R. § 23.107(b). In such a situation, the state court must, among other things, "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child' in this part." 25 C.F.R. § 23.107(b)(2).

Thus, Geouge was not required to *prove* that L.T. was an "Indian child" for the Act's notice provisions to become operative. As the Supreme Court of Michigan has observed, "the 'reason to know' standard for purposes of the notice requirement in 25 U.S.C. 1912(a) . . . set[s] a rather low bar." In re Morris, 815 N.W.2d 62, 73 (Mich. 2012).

Of course, our recognition that Geouge was faced with a low bar does not mean that she cleared it. In the proceedings below, Geouge never alleged that L.T. *is* an "Indian child"; rather, she only alleged that L.T. *might* be an Indian child. At oral argument in this Court, Geouge was asked if, in the time since she first raised the Act in the circuit court, she had found anything to support the position that L.T. was, in fact, an "Indian child." With credible candor, Geouge conceded that she remained unable to assert in good faith anything more than the Act "might apply."

Thus, we are faced with the question of whether that mere assertion, that the Act *might* apply, coupled with the other facts in the record, was sufficient to give the circuit court "reason to know" that L.T. is an "Indian child" subject to the Act's protections. Based on the record and the recently enacted regulations, we conclude that it is not.

Prior to the enactment of the regulations, courts were divided on what is required to satisfy the "reason to know" standard. While some held that a bald assertion was sufficient, others required something more. Compare In re Antoinette S., 129 Cal. Rptr. 2d 15, 20-21 (Cal. Ct. App. 2002); In re Dependency of T.L.G., 108 P.3d 156, 162 (Wash. Ct. App. 2005); In re J.T., 693 A.2d 283, 288-89 (Vt. 1997), with Illinois v. Amos (In re T.A.), 883 N.E.2d 639, 647 (Ill. App. Ct. 2008); A.J. v. Utah (Utah ex rel. M.J.), 266 P.3d 850, 856-58 (Ut. Ct. App. 2011); In re C.C., 932 N.E.2d 360, 363 (Ohio Ct. App. 2010).

The regulations were adopted, in part, to address such "disparate applications of [the Act] based on where the Indian child resides" and to make certain that the "uniform minimum Federal

standards intended by Congress" were applied in state courts. 81 Fed. Reg. 38,778.

Accordingly, the regulations provide that

> [a] court . . . has reason to know that a child . . . is an Indian child
> if:
>
> (1) Any participant in the proceeding, officer of the court involved
> in the proceeding, Indian Tribe, Indian organization, or agency
> informs the court that the child *is* an Indian child;
>
> (2) Any participant in the proceeding, officer of the court involved
> in the proceeding, Indian Tribe, Indian organization, or agency
> informs the court that it has discovered information indicating that
> the child *is* an Indian child;
>
> (3) The child who is the subject of the proceeding gives the court
> reason to know he or she *is* an Indian child;
>
> (4) The court is informed that the domicile or residence of the
> child, the child's parent, or the child's Indian custodian *is* on a
> reservation or in an Alaska Native village;
>
> (5) The court is informed that the child *is* or *has been* a ward of a
> Tribal court; or
>
> (6) The court is informed that either parent or the child *possesses*
> an identification card indicating membership in an Indian Tribe.

25 C.F.R. § 23.107(c) (emphasis added). Thus, all that is required for the Act's notice provisions

to apply is for a party or counsel to assert in good faith a belief that the child "is an 'Indian

child.'" 25 C.F.R. § 23.107(c)(1) & (2).

In this case, neither Geouge nor her counsel ever made such an assertion. Geouge's

counsel candidly admitted during oral argument in this Court that, at the time she filed the

- 21 -

motion to stay proceedings, she could not assert in good faith that L.T. *is* an Indian child.[7] She also confirmed that, after the motion to stay proceedings was denied in the circuit court, no steps were taken by Geouge to develop any information that would allow her to allege that L.T. *is* an Indian child. Given that the proceedings in the circuit court continued for months after the motion to stay proceedings was denied, the inability or unwillingness of Geouge to develop such a good faith belief is significant.

Moreover, it stands in stark contrast with the actions taken by the appellees. Faced with Geouge's bald assertion that the Act "might apply" because of the possibility that L.T. has Cherokee ancestry, appellees took it upon themselves to investigate the claim. Appellees identified for the circuit court the three federally recognized Cherokee tribes and the factors that each of the tribes considers in determining membership and eligibility for membership.[8] During the proceedings below, appellees contacted the three federally recognized Cherokee tribes, provided information regarding L.T., Geouge, and Geouge's father (the alleged link to Native American ancestry), and inquired if L.T. were eligible for membership in the tribes. Each tribe responded in the negative, indicating that L.T. was not eligible for membership in the respective

---

[7] Legally, there is a world of difference in asserting that something "is" the case and that something is merely possible. Geouge acknowledged the difference during oral argument in this Court, noting that the motion below sought additional time to investigate whether the Act *might* apply and that she was not in a position to assert that the Act *did* apply. We conclude that the language in 25 C.F.R. § 23.107(c) recognizes this distinction and requires that a party at least be willing to assert that the child *is* an "Indian child." Requiring a party to make such an allegation does not require proof that the allegation is true; virtually every unsuccessful suit will be premised upon allegations that a party asserted in good faith as true that a court ultimately finds to be false. It simply requires that, at a minimum, a party have a good faith belief that a child *is* an "Indian child" before the Act's notice requirements are triggered.

[8] The three federally recognized Cherokee tribes are the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma. See Indian Entities Recognized & Eligible to Receive Services, 82 Fed. Reg. 4915, 4916, & 4919.

- 22 -

tribes, and thus, was not an "Indian child" for the purposes of the Act as it relates to the three federally recognized Cherokee tribes.[9]

Given Geouge's inability to allege that L.T. *is* an Indian child and the information provided by the federally recognized Cherokee tribes, the circuit court did not have "reason to know that an Indian child is involved" in the proceedings as contemplated by 25 U.S.C. § 1912(a). Accordingly, the circuit court did not err in concluding that the Act, including its notice provisions, did "not apply to this case."

## II. Circuit Court's Analysis of and Conclusion Regarding the Factors Enumerated in Code § 63.2-1205

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court. Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion). Accordingly, although courts focus on the welfare of the child in adoption proceedings, Malpass v. Morgan, 213 Va. 393, 399, 192 S.E.2d 794, 799 (1972), Virginia courts long have recognized that constitutional concerns require that, for a court "to grant a petition for adoption over a birth parent's objection, there must be more than a mere finding that the adoption would promote the child's best interests." Copeland v. Todd, 282 Va. 183, 197, 715 S.E.2d 11, 19 (2011) (citing Malpass, 213 Va. at 398-99, 192 S.E.2d at 798-99).

Generally, consent of the birth parents is necessary for an adoption in Virginia. Code § 63.2-1202. Virginia's statutory scheme, however, allows for adoptions without the consent of a parent in certain, specifically delineated circumstances. See, e.g., Code § 63.2-1202(E), (F), (G), & (H).

---

[9] During oral argument in this Court, Geouge's counsel conceded that the evidence established that L.T. was not a member or eligible for membership in any of the three federally recognized Cherokee tribes, but argued that this fact did not eliminate the possibility that Geouge or L.T. were members or eligible for membership in some other federally recognized tribe.

Code § 63.2-1203(A) sets forth one such circumstance, providing that "[i]f, after consideration of the evidence, the circuit court finds that the valid consent of any person . . . whose consent is required is withheld contrary to the best interests of the child as set forth in § 63.2-1205 . . . , the circuit court may grant the petition without such consent." In turn, Code § 63.2-1205 provides that

> [i]n determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child . . . , the circuit court or juvenile and domestic relations district court, as the case may be, shall consider whether granting the petition pending before it would be in the best interest of the child. The circuit court or juvenile and domestic relations district court, as the case may be, shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

Regarding the factors delineated in Code § 63.2-1205, the Supreme Court has held that "[t]he eight factors in Code § 63.2-1205 . . . focus on *both* the parent and child and therefore compel a court to consider whether a parent's unfitness would be harmful to the child's welfare." Copeland, 282 Va. at 199, 715 S.E.2d at 20. Accordingly, the Supreme Court concluded that an adoption that occurs over a parent's objection pursuant to Code §§ 63.2-1203 and 63.2-1205 survives "constitutional due process scrutiny because [the statutory requirements] encompass far more than mere consideration of the child's best interests as defined in cases involving a contest between natural parents." Id. at 200, 715 S.E.2d at 20.

Recognizing the Supreme Court's decision in Copeland, Geouge does not challenge the constitutionality of the statutory scheme, but rather, challenges the conclusions drawn by the

circuit court regarding the factors delineated in Code § 63.2-1205. Specifically, in her second assignment of error, she contends that the circuit court erred in determining that she had withheld consent contrary to the best interests of L.T. In her third assignment of error, she contends that the circuit court abused its discretion in the manner in which it weighed certain evidence in reaching its conclusions. In both of these assignments of error, Geouge recognizes that she must establish that the circuit court abused its discretion in makings its findings, determining the weight to apply to each factor, and in reaching its conclusions.

The abuse of discretion standard does not permit this Court to substitute its judgment for that of a circuit court. As we have noted previously

> [a]n abuse of discretion occurs only when "reasonable jurists" could not disagree as to the proper decision. This principle necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts — yet still remain entirely reasonable. This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.

Hamad v. Hamad, 61 Va. App. 593, 607, 739 S.E.2d 232, 239 (2013) (internal citations omitted). Accordingly, so long as the circuit court properly considered the statutory factors, we can reverse its conclusions only if they are beyond the pale of reasonableness.

Here, the circuit court heard the testimony of more than twenty witnesses over the course of a two-day trial. In addition to the testimony, more than thirty exhibits, ranging from medical records to home visit reports, were admitted and reviewed by the circuit court. Despite the evidence, Geouge alleges that the court erred in its conclusions regarding her efforts to maintain legal custody of L.T., her relationship with her other children, and whether her withholding of consent was detrimental to L.T.'s best interests.

There was evidence in the record to support the circuit court's factual findings and ultimate conclusions in this case. Regarding Geouge's efforts to maintain custody of L.T., the

circuit court acknowledged that Geouge had tried to do so, but found that she had "sabotaged her own efforts by getting herself back into prison . . . and [t]hat was her fault." Similarly, although Geouge adduced evidence that she had been a stay-at-home mother for her other children and that, at times, her relationships with the other children were good, there was also evidence that her repeated violations of the law, substance abuse issues, occasionally violent behavior, and repeated incarcerations had undermined those relationships. Because there was evidence to support the circuit court's finding that "the relationship with the other children is unsatisfactory," we cannot say that the circuit court erred in so finding.

On appeal, Geouge does not just challenge the factual findings that the circuit court made regarding each of the statutory factors; she also challenges the circuit court's ultimate conclusion that she was withholding her consent to the adoption contrary to L.T.'s best interests. In doing so, she argues that the circuit court failed to fully appreciate the progress and efforts she made to be a better parent while incarcerated and what she characterizes as the appellees' efforts to thwart her relationship with L.T.[10]

This argument misunderstands our role on appeal. Although the circuit court could have made different factual findings regarding the statutory factors or weighed the significance of the factors differently, nothing in the statutory scheme required it to do so.

The weighing of the statutory factors is, by necessity, fact-specific and highly discretionary. The discretion to make the relevant determinations is vested where the judicial branch comes into the closest contact with the child, the biological parents, and the prospective

---

[10] Although the circuit court found in Geouge's favor on the factor related to the efforts of others to thwart her relationship with L.T. based on Traylor's actions, Geouge argues that the circuit court should have given greater consideration to appellees' actions. Specifically, she argues that appellees thwarted her efforts by continuing with the adoption over her objection, refusing to allow L.T. to visit her in prison, not informing Geouge's other children that L.T. was their sister, and in having L.T. baptized at their church.

adoptive parents–the circuit court. Even if we might have rendered different factual findings or weighed the statutory factors differently, we will not second-guess the circuit court's exercise of judgment regarding the statutory factors. When, as here, the circuit court reviewed the statutory factors, based its findings on evidence presented, and did not commit legal error, there is no basis for this Court to reverse its decision.

### III. Circuit Court's Interpretation of Visitation Order

In her fourth assignment of error, Geouge asserts that the circuit court erred in "concluding that [a] visitation order between [Geouge] and [Traylor] affected the actions of [a]ppellees." Specifically, Geouge alleges that the circuit court misinterpreted a JDR court order regarding her petition for visitation with L.T. while Geouge was incarcerated.[11] By refusing her petition, the JDR court declined to order Traylor to take L.T. to the prison to visit Geouge. Geouge contends that the circuit court read the order not as declining to order visitation, but rather, as "prohibit[ng] contact between [Geouge] and L.T."

Fatal to Geouge's argument is that the circuit court did not interpret the JDR court order in such a fashion. When Geouge raised this argument in the motion to reconsider in the circuit court, the circuit court responded in its letter opinion that it had not interpreted the JDR court order in this manner, noting that it "did not, in fact, find that a denial of visitation was equivalent to a prohibition of physical contact." (Internal quotation marks and citation omitted).

Because Geouge has assigned error to a ruling that the circuit court did not make, the circuit court could not and did not err in the manner alleged by Geouge in the assignment of error. Thus, we cannot take cognizance of the claimed error. Culpeper Reg'l Hosp. v. Jones, 64

---

[11] Testimony established that, at least at one point, appellees believed the order prevented them from taking L.T. to visit Geouge while she was incarcerated. Because appellate review is limited to the actions of the circuit court, appellees' misunderstanding of the order ultimately is immaterial unless that misunderstanding was adopted by the circuit court.

Va. App. 207, 212 n.2, 767 S.E.2d 236, 239 n.2 (2015) (rejecting an appellate argument because the fact finder did not take the action that appellant alleged constituted error); cf. Rule 5A:12(c)(1)(ii).[12]

### IV. Denial of Continuance Request

Geouge argues that the circuit court erred in denying her motion to continue the December 2016 trial until shortly after her scheduled release from prison in January 2017. Specifically, she argues that "[a] continuance out to a date certain [in] February [2017] would have changed the color of the case" by allowing her to present herself as a ready parent whose efforts at custody would not have been hampered by being incarcerated at the time a decision was being made.

The decision of whether to grant a continuance is committed to the discretion of the circuit court. Haugen v. Shenandoah Valley Dep't of Soc. Servs., 274 Va. 27, 34, 645 S.E.2d 261, 265 (2007). We will reverse a circuit court's "ruling on a motion for a continuance . . . only upon a showing of abuse of discretion *and* resulting prejudice to the movant." Id. Geouge argues she was prejudiced by the ruling because, at the end of the litigation, "[s]he lost contact with her only daughter." This misunderstands the prejudice inquiry.

Although no one could dispute that Geouge ultimately suffered a significant loss, her relationship with L.T., as a result of the litigation, that does not mean she was prejudiced by the denial of her request for a continuance. To establish the necessary prejudice, Geouge must do more than note she lost the case; she must establish that the decision to deny her a continuance

---

[12] Although Rule 5A:12 applies in cases that come before us by way of the petition process, appellants in appeals of right would be well-served by observing its requirements in drafting assignments of error. Specifically, as it relates to this case, Rule 5A:12(c)(1)(ii)'s admonition that "[a]n assignment of error which does not address the findings or rulings in the trial court or other tribunal from which an appeal is taken . . . is not sufficient."

prevented her from presenting her case or otherwise caused her to lose the case. This she cannot do.

Geouge was able to participate in circuit court proceedings. Her interests were ably represented by her current counsel. Geouge appeared, testified, had witnesses called on her behalf, filed numerous motions, and made substantial arguments as to the proper resolution of the case. The circuit court's ultimate ruling against her was the result of its determination of the facts of the case and not the result of the denial of her continuance request.

We acknowledge that Geouge's *history* of criminal activity, substance abuse, and subsequent incarcerations was part of the circuit court's decision-making process. However, those factors existed as a result of Geouge's behavior and would have existed whether the trial took place a month before her release from prison or in the days or months immediately after her release. They were not caused or exacerbated by the circuit court's denial of the requested continuance.

Geouge responds by noting that, in issuing its ruling from the bench in December 2016, the circuit court commented that whether Geouge would be able to overcome her issues with criminality, substance abuse, and incarceration to be able to be a good parent to L.T. was a matter of "conjecture." According to Geouge, the circuit court's recognition regarding the uncertainty of Geouge's future required either granting the continuance or her subsequently filed motion to reconsider so that the circuit court could know how she was adapting to her post-release circumstances.

Even if the circuit court had delayed the proceeding to February or March of 2017, its ultimate decision regarding Geouge still would have been subject to some level of conjecture because the future is uncertain. As we have noted, "[n]o one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful

- 29 -

period serve as good indicators of what the future may be expected to hold." Frye v. Spotte, 4 Va. App. 530, 536, 359 S.E.2d 315, 319 (1987). Thus, although a proceeding in February or March might have allowed Geouge to put on evidence that she had been able to avoid reoffending for a week or a month, had obtained appropriate living quarters, etc., the circuit court still would have been required to engage in conjecture about what the future held for Geouge regarding her ability to stay out of prison and parent L.T. given her years-long history of criminal and substance abuse issues. Thus, conjecture was necessitated by the circumstances and Geouge's past conduct and not because the circuit court denied the requested continuance.

Accordingly, given the failure of Geouge to demonstrate the necessary prejudice, we cannot say the circuit court erred in denying the requested continuance.[13]

## V. Lack of Notice Regarding Petition for Adoption

In her final assignment of error, Geouge challenges the final order of adoption on the grounds that she was not served with the petition for adoption or given notice that the petition had been filed until after the order granting the petition for adoption had been entered. Specifically, she argues that, pursuant to Code § 63.2-1203(A)(1), the adoption could occur over her objection only if it occurred at least "[f]ifteen days after personal service of notice of petition on the party or parties whose consent is required by this section." Appellees argue that the notice

---

[13] Alternatively, Geouge has not established that the denial of the continuance constituted an abuse of discretion. The litigation began with the petition filed in the JDR court in November 2015, and the parties had litigated fully in that forum the question of whether Geouge was withholding her consent contrary to L.T.'s best interests. Thus, although Geouge was entitled to a trial *de novo* in the circuit court, the litigation had been ongoing for over a year at the time of the December 2016 trial in the circuit court. We long have recognized that delays in resolving child welfare cases can be detrimental to the children involved. Cf. Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Given the length of time the case had been ongoing, it was not beyond the pale for the circuit court to believe that even a short continuance had the potential to be harmful to the child while providing little in the way of benefit to the parties or the court. Thus, although the circuit court certainly had the authority to grant the requested continuance, we cannot say that, considering all of the facts and circumstances, its refusal to do so was unreasonable.

Geouge received regarding the proceedings in which the JDR court and the circuit court determined that she was withholding her consent to the adoption contrary to L.T.'s best interests sufficed and that additional notice was not required because, once the circuit court made its findings regarding consent, the adoption was no longer proceeding under Code § 63.2-1203, but rather, was proceeding under Code § 63.2-1233.[14]

"[A]s an appellate court, we seek the best and narrowest ground available for our decision." Harvey v. Commonwealth, 65 Va. App. 280, 285 n.2, 777 S.E.2d 231, 234 n.2 (2015) (internal quotation marks and citations omitted). It is often the case that the best and narrowest ground for resolving a case involves not the merits of the underlying issue, but rather, whether the alleged error had any effect on the outcome. See Commonwealth v. White, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) ("In this case, the best and narrowest ground is our conclusion that the alleged trial court error, if error at all, was harmless as a matter of law."). "Under the doctrine of harmless error, we will affirm the circuit court's judgment when we can conclude that the error at issue could not have affected the court's result." Northam v. Va. State Bar, 285 Va. 429, 445, 737 S.E.2d 905, 913-14 (2013) (quoting Forbes v. Rapp, 269 Va. 374, 382, 611 S.E.2d 592, 597 (2005)). Accordingly, we must affirm the decision of the circuit court if we conclude

---

[14] Appellees also argue that the notice argument is procedurally defaulted because Geouge did not raise the objection in the circuit court within twenty-one days of the entry of the order of adoption, and thus, the argument is barred by Rule 5A:18. At oral argument in this Court, appellees acknowledged a logical flaw in the argument going so far as to characterize their own argument as "circular." Appellees recognize that Geouge raised her notice objection as soon as she became aware of the proceeding for which they failed to provide her notice. Given the circumstances and the possibility that a failure of notice might subject the order to challenge, we conclude that the notice issue is properly before us.

that any error in failing to provide additional notice would not have changed the circuit court's ultimate decision.[15]

Here, the circuit court conducted a two-day trial to determine whether Geouge was withholding consent to the adoption contrary to L.T.'s best interests. The parties fully litigated these issues and clearly understood that, if the circuit court granted the appellees' petition regarding consent, adoption was the next step. The March 10, 2017 order contains, as part of the caption, the notation: "In Re: Adoption of L.S.T."

Geouge participated in the trial, thoroughly defended her position throughout, and expressly recognized in her motion seeking reconsideration of the circuit court's ruling that the proceeding dealt with her "right to raise her daughter." Moreover, once Geouge became aware of the order of adoption, she interposed objections. Other than the objection regarding notice, her stated objections simply reiterated the arguments and objections she made during and regarding the December 2016 trial.

Because she raised nothing new in her objections, we can say with certainty that the failure to give additional notice in this case did not affect the outcome. Geouge conceded as much at oral argument in this Court, characterizing the notice argument and any hearing that additional notice might have occasioned as purely "*pro forma*" because it would have been nothing but a rehash of the same arguments before "the same circuit court judge." Thus, even Geouge concedes that the outcome would not have changed if she had received additional notice.

---

[15] "The harmless-error concept is no mere prudential, judge-made doctrine of appellate review. Harmless error is a legislative mandate, which has been part of our statutory law since the early 1900s, and *limits the adjudicatory power of Virginia appellate courts*." White, 293 Va. at 419, 799 S.E.2d at 494 (emphasis added); see also Code § 8.01-678.

Accordingly, it is clear that any failure to provide additional notice does not provide a basis for reversing the decision of the circuit court.[16]

CONCLUSION

For the reasons stated above, we conclude that the circuit court did not commit reversible error as asserted by Geouge. Accordingly, the judgments of the circuit court are affirmed.

<u>Affirmed.</u>

---

[16] As noted above, the termination of parental rights involves a liberty interest that is protected by the Due Process Clause of the United States Constitution. See Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 829, 433 S.E.2d 500, 505 (1993). Generally, due process requires that "a party 'has reasonable notice and reasonable opportunity to be heard and to present his claim or defense, due regard being had to the nature of the proceeding and the character of the rights which may be affected by it.'" Eddine v. Eddine, 12 Va. App. 760, 763, 406 S.E.2d 914, 916 (1991) (quoting Dohany v. Rogers, 281 U.S. 362, 369 (1930)). Nevertheless, because Geouge does not raise a constitutional challenge regarding the lack of notice, but rather, only raises a question of whether she received the notice allegedly required by statute, we do not address the constitutional issue here.