JANE P. WISEMAN, PRESIDING JUDGE:
*375 ¶1 Dava White Eagle (Mother) appeals a trial court order denying her motion for new trial and an order terminating her parental rights after jury verdict. The dispositive issue[1] before us is whether there was trial court error or abuse of discretion in denying the motion for new trial because the federal Indian Child Welfare Act (ICWA) applied to the proceedings at the time of trial. After review, we conclude it was error not to grant the motion for new trial when ICWA applied to the proceedings when the trial started. The decision is reversed and the case is remanded for further proceedings.
FACTS AND PROCEDURAL BACKGROUND
¶2 A trial on the State of Oklahoma's petition to terminate Mother's parental right to JeWE, IWE and JoWE, was held on January 23, 24 and 25, 2017. After deliberation, the jury returned a verdict to terminate Mother's parental rights on the grounds of abandonment pursuant to 10A O.S. § 1-4-904(B)(2), failure to correct the conditions that led to the adjudication of the children as deprived pursuant to 10A O.S. § 1-4-904(B)(5), and failure to contribute to the support of the children pursuant to 10A O.S. § 1-4-904(B)(7). The jury found by clear and convincing evidence that Mother's parental rights should be terminated on each of these grounds.
¶3 At trial, Mother testified she was a member of the Cheyenne Arapaho Tribe. When asked whether JeWE, IWE and JoWE were members of an Indian tribe, she stated, "Not yet." She testified, "I've got an application for them to-they're in the process of being enrolled in the Choctaw Tribe." She explained that the children were not members of the Cheyenne Arapaho Tribe because of their blood quantum, indicating that the children must be one-quarter to qualify for membership in the Cheyenne Arapaho Tribe. She said the children were "in the process of being enrolled in the Choctaw Tribe." At trial, State asked Mother, "You know that the Choctaw Nation has also sent a letter that says they don't qualify. Do you understand that?" Mother replied, "No. ... 'Cause I spoke with them recently and I talked with the Indian child welfare from the Choctaw Tribe and she said that they were in the process of being enrolled." Mother "didn't know where-at what point they were at; she just knew they were in the process." She stated that she is "becoming an established member because in order for [the children] to become members [she has] to be an established member." She stated that she did not switch tribes and she is still enrolled with the Cheyenne Arapaho Tribe. She explained that she "became an established member with the Choctaw Tribe," which "means that [she doesn't] receive any benefits from the Choctaw Tribe because [she is] still an enrolled member of the Cheyenne Tribe." She agreed that she can be an enrolled member of only one tribe. She is becoming an established member solely to get the children enrolled with the Choctaw Tribe and "[t]hey will receive the whole benefits of whatever the Choctaw Tribe provides for ... their tribal members."
¶4 When later questioned about her efforts to enroll the children with the Choctaw Tribe, she stated that the process was taking *376 so long because she was trying to get birth certificates and Social Security cards for the children. She thought she could get them on her own, but then found she could get them from DHS. As to the process of enrolling the children, she testified:
Then I had to call up to genealogy at the Choctaw Nation and find out who was on the roll to get-to get my kids on, because it's through lineage. I found that it was my mom's-my great-grandpa was the one who was on the roll. So I had to tie my relationship to my great-grandpa. So I had to get birth certificates for my mom and my mom's dad, and death certificates for both of them, which that took some time getting.
And I had to-first I had to find out my grandpa-my great-grandpa's roll number and find out if he was even on the roll.
So I found all that out, got the birth certificate for my grandpa and death certificate for my grandpa and my mom. And then I had to get my birth certificate and then get birth certificates of my children and then the social security cards of everybody except for my mom and my grandpa. And then I had to mail all those in.
Mother agreed that it was "quite a process." She said it usually takes three months for the Choctaw Tribe to make a decision.
¶5 Scott Walters, employed by DHS as a child welfare specialist, was asked at trial: "Now, all through the time that this case has been pending mom has attempted to enroll her children in various Indian tribes but that has not been successful to this point; is that correct?" Walters replied, "That is correct." Walters stated, "We did receive a letter from the Cheyenne Arapaho Tribe as well as the Choctaw Tribe stating that the children were not eligible for enrollment." He testified that at the beginning of the case, DHS approached it as though the children were Indian children.
¶6 In its final order terminating Mother's parental rights filed January 31, 2017, the Court stated that it had previously found that JeWE, IWE and JoWE "are not members or eligible for membership with an Indian Nation/Tribe and are not Indian Children as defined by the State and Federal Indian Child Welfare Acts." It is the children's status as Indian children at the time of trial on which we focus in this appeal.
¶7 After the final order was filed on January 31, 2017, Mother filed a motion for new trial pursuant to 12 O.S. § 651 on February 3, 2017. Mother alleged, among other things:
Shortly after the announcement of the verdict by the Jury, the Mother received notice by mail that the children were enrolled members of the Choctaw Nation of Oklahoma and that said membership was certified on January 10, 2017 by the United States Department of the Interior Bureau of Indian Affairs and on January 20, 2017 by the Choctaw Nation of Oklahoma.
¶8 Mother attached to her motion for new trial copies of each child's documentation of Certificate of Degree of Indian Blood, dated January 10, 2017, from the United States Department of Interior Bureau of Indian Affairs (BIA), which indicated each child "is 1/8 degree Indian blood of the Choctaw Tribe." Mother also attached copies of a Choctaw Nation membership card for each child stating each child "is 1/8 Choctaw and is a member by blood of the Choctaw Nation of Oklahoma." Each card also stated, "Date Approved: 01/20/2017."
¶9 The motion for new trial noted, "That Mother testified at trial as to her diligent effort to enroll the children with the tribe and to obtain proof of enrollment prior to trial but that the evidence of enrollment was not and could not have been discovered until after the jury rendered its verdict." She asserted, "That because the children were enrolled members of an Indian Tribe prior to and at the time of trial, all proceedings, including the trial, were subject to the Indian Child Welfare Act 25 U.S.C. 1901 et seq. and Oklahoma Indian Child Welfare Act 10 O.S. § 40 et seq." She further asserted:
That no notice of the proceedings was given to the Tribe, no expert witness testimony was presented, and the State proceeded under an improper burden of proof at trial all in violation of the requirements of ICWA and OICWA and such violation materially affected substantial rights of the Mother, prevented her from having a fair *377 trial and constitutes an error requiring a new trial.
¶10 State filed an objection and response asserting, inter alia : "At the time of trial, the evidence and record showed the children were not members of an Indian tribe." It claimed that "the only other way the children could be defined as Indian children implicating the application of ICWA was if the children were 'eligible for membership [in a tribe] of which the biological parent is a member.' See BIA Regulations § 23.108(a)." State argued that, because Mother testified she is a member of the Cheyenne Arapaho Tribe and the children are not eligible to be members of that tribe, "but that she was trying to enroll the children as Choctaw (of which she could not be a full member given her membership in Cheyenne Arapaho), there was no reason to believe the children met the definition of 'Indian Child' at the time of trial given the evidence and testimony in the record." It argued that the record in the case showed that the children were not tribal members at the time of trial and the record only reflected their membership after Mother filed the motion for new trial.
¶11 The trial court denied the motion for new trial, and Mother appeals.
STANDARD OF REVIEW
¶12 "A motion for new trial is addressed to the sound discretion of the trial court. Unless it is apparent that the trial court erred in some pure question of law or acted arbitrarily the ruling will not be disturbed on appeal." Barringer v. Baptist Healthcare of Oklahoma , 2001 OK 29, ¶ 5, 22 P.3d 695. "ICWA's applicability is a question of law. The standard of review for questions of law is de novo ." In re M.H.C. , 2016 OK 88, ¶ 7, 381 P.3d 710.
ANALYSIS
¶13 ICWA's notice provisions are triggered in an "involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved." 25 U.S.C.A. § 1912(a). The question presented is whether JeWE, IWE and JoWe are Indian children within the meaning of ICWA, 25 U.S.C.A. §§ 1901 - 1963. ICWA states:
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.
25 U.S.C.A. § 1902.
¶14 ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4).
¶15 Under the title of "How should a State court determine if there is reason to know the child is an Indian child?", 25 C.F.R. § 23.107 provides:
(a) State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.
(b) If there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an "Indian child," the court must:
(1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological *378 parent is a member and the child is eligible for membership); and
(2) Treat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an "Indian child" in this part.
(c) A court, upon conducting the inquiry required in paragraph (a) of this section, has reason to know that a child involved in an emergency or child-custody proceeding is an Indian child if:
(1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
(2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
(3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
(5) The court is informed that the child is or has been a ward of a Tribal court; or
(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.
(d) In seeking verification of the child's status in a voluntary proceeding where a consenting parent evidences, by written request or statement in the record, a desire for anonymity, the court must keep relevant documents pertaining to the inquiry required under this section confidential and under seal. A request for anonymity does not relieve the court, agency, or other party from any duty of compliance with ICWA, including the obligation to verify whether the child is an "Indian child." A Tribe receiving information related to this inquiry must keep documents and information confidential.
(Emphasis added.)
¶16 In Geouge v. Traylor , 68 Va.App. 343, 808 S.E.2d 541, 551 (2017), the Virginia Court of Appeals analyzed the CFR's "reason to know" requirement and concluded:
[ICWA's] notice provisions are triggered when a state court "knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). If, for the notice provisions to become operative a party had to prove that a child was an "Indian child," the statutory language would provide only that notice is necessary when the state court "knows that an Indian child is involved." The inclusion of the less certain "reason to know" in addition to the more definitive "knows" is a clear indication that Congress intended the notice provisions to be effective in situations where there was still question as to whether the child is an Indian child.
....
The recently adopted regulations implementing the Act also make clear that the "reason to know" standard requires less than actual proof that the child meets the statutory definition of "Indian child." The regulations expressly recognize that state courts will be faced with situations in which "there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an 'Indian child.' " 25 C.F.R. § 23.107(b). In such a situation, the state court must, among other things, "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child' in this part." 25 C.F.R. § 23.107(b)(2).
Thus, [the natural parent] was not required to prove that L.T. was an "Indian child" for the Act's notice provisions to become operative. As the Supreme Court of Michigan has observed, "the 'reason to know' standard for purposes of the notice requirement in 25 U.S.C. 1912(a)... set[s] a rather low bar." In re Morris , 491 Mich. 81, 815 N.W.2d 62, 73 (2012).
*379 ¶17 In that case, however, the Virginia Court held:
Given [the natural parent's] inability to allege that L.T. is an Indian child and the information provided by the federally recognized Cherokee tribes, the circuit court did not have "reason to know that an Indian child is involved" in the proceedings as contemplated by 25 U.S.C. § 1912(a). Accordingly, the circuit court did not err in concluding that the Act, including its notice provisions, did "not apply to this case."
Id . at 553.
¶18 We conclude the court here did have reason to know JeWE, IWE and JoWE were Indian children. In December 2016, the BIA issued "Guidelines for Implementing the Indian Child Welfare Act "[2] (Guidelines ), which "are intended to assist those involved in child custody proceedings in understanding and uniformly applying the Indian Child Welfare Act (ICWA) and U.S. Department of the Interior (Department) regulations." Guidelines , p. 4. "While not imposing binding requirements, these guidelines provide a reference and resource for all parties involved in child custody proceedings involving Indian children." Id .
¶19 The Guidelines specifically address the discovery of information after child custody proceedings have started:
Subsequent discovery of information.
Recognizing that facts change during the course of a child-custody proceeding, courts must instruct the participants to inform the court if they subsequently learn information that provides "reason to know" the child is an "Indian child." Thus, if the State agency subsequently discovers that the child is an Indian child, for example, or if a parent enrolls the child in an Indian Tribe, they will need to inform the court so that the proceeding can move forward in compliance with the requirements of ICWA.
Guidelines , p. 11.
¶20 The Guidelines also offer the following guidance:
Inquiry each proceeding.
The rule does not require an inquiry at each hearing within a proceeding; but, if a new child-custody proceeding (such as a proceeding to terminate parental rights or for adoption) is initiated for the same child, the court must make a finding as to whether there is "reason to know" that the child is an Indian child. In situations in which the child was not identified as an Indian child in the prior proceeding, the court has a continuing duty to inquire whether the child is an Indian child .
Id . (emphasis added). The Guidelines further instruct:
When one or more factors is present.
If there is "reason to know" the child is an "Indian child," the court needs to ensure that due diligence was used to identify and work with all of the Tribes of which there is a reason to know the child may be a member or eligible for membership, to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership). In order to provide the information that the court needs, the State agency or other party seeking placement should ask the child, parents, and potentially extended family which Tribe(s) they have an affiliation with and obtain genealogical information from the family, and contact the Tribe(s) with that information.
Id .
¶21 The Guidelines recognize, "The best source for a court to use to conclude that a child or parent is a citizen of a Tribe (or that a child is eligible for citizenship) is a contemporaneous communication from the Tribe documenting the determination." Id . at 12 (footnote omitted). The Guidelines suggest that where a child's status is in question, the child should be treated as an Indian child unless and until it is determined the child is not an Indian child within the meaning of ICWA. Id . "If, based on feedback from the relevant Tribe(s) or other information, the court determines that the child is not an 'Indian child,' then the State may proceed under its usual standards." Id .
*380 ¶22 A complicating factor is that the Choctaw Nation previously informed the trial court that JeWE, IWE and JoWE were not members of the Choctaw Nation. But Mother also explained to the court at trial that she was an established member of the Choctaw Nation and had submitted the information to the Nation to establish membership for her children. The question facing the trial court, and now this Court on appeal, is whether this information was enough to trigger the requirements of ICWA because there was reason to know these children were Indian children within the meaning of ICWA. We conclude that it was.
¶23 These were not merely Mother's claims at trial that the children might be Indian children. Mother detailed at trial how she traced her Choctaw ancestry to her great-grandfather and provided documentation to the Choctaw Nation. She also testified that she is an established member of the Choctaw Nation, which would qualify the children for membership in the Choctaw Nation. Mother's testimony was sufficient to give State and the trial court adequate reason to know at the time of the termination trial that these were Indian children.
¶24 The children were, in fact, eligible for membership and actually members of the Choctaw Nation and ICWA applied to the proceedings when the trial began. We are guided by the Oklahoma Supreme Court's decision in In re M.H.C. , 2016 OK 88, 381 P.3d 710, in which the Cherokee Nation filed a motion to transfer a deprived child case to tribal court after the mother became an enrolled member of the Cherokee Nation. Id . ¶ 0. The Supreme Court found no trial court error in finding that ICWA applied to the case even though the child was not an Indian child within the meaning of ICWA when State filed the case. Id . ¶ 1. The child at the heart of the deprived action was born in September 2013 and placed in DHS custody on November 5, 2013. Id . ¶ 2. Although the Cherokee Nation appeared at the initial appearance on November 21, 2013, the mother informed the court she was not a member of the Cherokee Tribe but she had a Certificate of Degree of Indian Blood. Id . After State informed the Cherokee Nation that it planned to adjudicate the child as deprived, the Nation notified DHS that the child was eligible for enrollment and sent DHS an enrollment application. Id . ¶ 3. DHS did not complete the application and the Cherokee Nation later sent DHS three additional applications. Id . The trial court ruled on December 3, 2013, that ICWA did not apply to the case. Id . No one informed the mother of the benefits and protections provided by ICWA, and she initially declined to enroll the child as a tribal member. Id .
¶25 State filed a motion to terminate the mother's parental rights in September 2014 and the court entered a default order on December 18, 2014, terminating her rights after she failed to appear. Id . ¶ 5. The mother became an enrolled citizen of the Cherokee Nation on February 5, 2015. Id . Cherokee Nation filed a motion to intervene on February 19, 2015, and a motion to transfer the case to tribal court on March 24, 2015. Id . The trial court later vacated the default order terminating the mother's parental rights due to defective service. Id . The trial court also granted the motion to transfer to tribal court. Id . ¶ 6. State and the child's foster mother objected to the transfer. Id .
¶26 The Supreme Court noted, "ICWA applies prospectively to a proceeding when the record establishes the child meets ICWA's definition of an Indian child." Id . ¶ 16. The Court rejected the argument that the trial court erred when it found "ICWA applicable at a stage in the proceeding later than the proceeding's commencement." Id . Instead, the Oklahoma Supreme Court stated, "We agree with the Supreme Court of Nebraska, 'the provisions of ICWA ... apply prospectively from the date Indian child status is established on the record.' " Id . ¶17 (quoting In re Adoption of Kenten H., 272 Neb. 846, 725 N.W.2d 548, 555 (2007) ). In line with this reasoning, the Supreme Court held:
Upon the date the record shows that ICWA is applicable, the proceedings must be ICWA compliant. In the present case, ICWA became applicable on February 5, 2015, when the natural mother gained membership in the Cherokee Nation, making the child an Indian child under *381 ICWA. Retroactive application of ICWA is not applicable here to invalidate the district court's prior orders.
....
The provisions of ICWA become effective in a state child custody proceeding on the date that the record supports a finding that ICWA applies.
Id . ¶¶ 17, 20 (emphasis added). It is important to note that the Supreme Court stated that the date ICWA became applicable was the date the mother gained membership, February 5, 2015. The Court determined this was "the date the record shows that ICWA is applicable." Id . ¶ 17.
¶27 State argued in our present case, "[P]roof of the children's Indian status was established on the record on February 3, 2017," the date of the motion for new trial. We reject this argument because it clearly contradicts the holding of In re M.H.C. , which unambiguously held that "the date the record shows that ICWA is applicable" was the date that the mother gained membership. Id . Pursuant to the holding of In re M.H.C. , the key date is not the date the children's membership is entered into the court record, but the date the membership became entered into the Choctaw Nation's record.
¶28 Although it is clear the trial court and State may not have been affirmatively informed of the children's membership in the Choctaw Nation until February 3, 2017, this date is not determinative of the date ICWA became applicable. We reiterate that the trial court and State had reason to know at trial that ICWA may very well apply and this warranted further investigation. Despite the Choctaw Nation's previous communication about the children's membership status, Mother's detailed testimony about establishing her own membership and the children's membership raised red flags that further inquiry at trial was needed despite the Choctaw Nation's earlier communication.
¶29 We recognize that that does not mean that IWCA applied to the case from the date it was filed in 2011. ICWA became applicable on the date the children became eligible for enrollment[3] or the date they enrolled, which was January 20, 2017. At the latest, ICWA applied as of January 20, 2017, a date before trial started. ICWA's provisions, including the heightened burden and expert witness requirements, were applicable at trial. ICWA specifically commands:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C.A. § 1912(f). These requirements were not met in this case.
¶30 We acknowledge that the children have been out of Mother's home for a very extended period of time and this decision entails further delay. We cannot, however, ignore ICWA's requirements and the rights of the Choctaw Nation and its interest in these children, who are members of the Nation. The better course in the circumstances, given Mother's testimony at trial, would be to contact the Choctaw Nation to determine whether the children were eligible for membership at the time of trial.
¶31 Given ICWA's applicability to the trial of this case and the failure to comply with ICWA requirements, it was error as a matter of law to deny Mother's motion for new trial. The decision of the trial court must be reversed and the case remanded for further proceedings.
CONCLUSION
¶32 Mother was entitled to a new trial because ICWA applied when the trial on the termination of her parental rights to JeWE, IWE and JoWE was held. We reverse the *382 trial court's decision and remand for further proceedings.
¶33 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
THORNBRUGH, C.J., and FISCHER, J., concur.

Although Mother raises other grounds for reversal, the question of ICWA's application is dispositive and these additional propositions of error will not be addressed.

Guidelines for Implementing the Indian Child Welfare Act , December 2016, https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf.

Depending on the Choctaw Nation's membership requirements, this could have been the date Mother became an established member, if becoming an established member made the children eligible for enrollment in the Choctaw Tribe. It is unclear the date on which Mother became an established member or if this date triggered the children's eligibility under the Choctaw Nation's membership laws, rules, or regulations.