COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Malveaux and Chaney

JAKE WAJED INAM

v.      Record No. 1379-22-3

ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE GLEN A. HUFF
NOVEMBER 8, 2023

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
David B. Carson, Judge

(John S. Koehler; The Law Office of James Steele, PLLC, on brief),
for appellant. Appellant submitting on brief.[1]

(Timothy R. Spencer, City Attorney; Jennifer L. Crook, Assistant
City Attorney; Sarah Jane Newton, Guardian ad litem for the minor
children, on brief), for appellee. Appellee and Guardian ad litem
submitting on brief.[2]

Jake Wajed Inam (father) appeals the circuit court's order terminating his parental rights to

his children, H.W. and S.W. Father argues that the circuit court abused its discretion by not

granting him a continuance after his subpoenaed witnesses failed to appear at trial. This Court finds

no error and affirms the circuit court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Appellant waived oral argument.

[2] Appellee waived oral argument so long as this matter was not scheduled for hearing.

BACKGROUND[3]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). Father is the biological parent of four children: W.W., Z.W., S.W., and H.W. Only father's two younger children, S.W. and H.W., are minors and the subject of this appeal.[4]

On July 8, 2020, the Roanoke City Department of Social Services (the Department) received a report that father's oldest child, W.W., called the police after locking herself in the bathroom because father was following her around the house and cursing at her. Father had been drinking alcohol and "broke down" the bathroom door. After the incident, the Department interviewed father and the four children. Father claimed that he was "being harassed by an 'Anglo-Indian' organization" that was "broadcasting things from inside his house." To cope with "being harassed," father admitted to consuming alcohol daily. All four children confirmed that father was drinking to excess and claimed that he was "prone to outbursts of anger." The children reported that father's behavior had become "increasingly unstable." After being unable to find a viable relative placement, the Department sought to remove the children from father's care and place them in

---

[3] The record in this case was sealed. We unseal only the specific facts stated in this opinion, "finding them relevant to our decision." *Daily Press, LLC v. Commonwealth*, 301 Va. 384, 393 n.1 (2022). "The remainder of the previously sealed record remains sealed." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 452 n.1 (2022) (quoting *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017)).

[4] Father and the children's biological mother divorced in 2014, and he and the children moved from Pakistan to the United States. The children's mother signed permanent entrustment agreements for S.W. and H.W. Father's older two children, W.W. and Z.W., are over the age of 18, and therefore the lower court's proceedings concerning them are not addressed herein.

foster care. At the time of the removal, W.W. was 17 years old, Z.W. was 15 years old, S.W. was 12 years old, and H.W. was 9 years old.

The Roanoke City Juvenile and Domestic Relations District Court (the JDR court) entered emergency removal orders and preliminary removal orders for all four children. The JDR court subsequently adjudicated that the children were abused or neglected and entered dispositional orders.

After the children entered foster care, the Department established requirements father had to complete before he would be reunited with them. The Department required father to regularly attend visitations with the children, maintain contact with the Department, and comply with its recommendations. Father also had to obtain and maintain sobriety, complete a substance abuse assessment, attend Alcoholics Anonymous (AA) meetings on a weekly basis, and participate in alcohol and drug screens. In addition, father had to participate in outpatient counseling and the Department referred father for a psychological and parental capacity evaluation.

Initially, the Department offered father weekly supervised visitation with the children. During those visits, father repeatedly discussed how there was "a group of people that were out to get him and his children." Father's paranoia upset the children. Beginning in June 2021, the Department and service providers noticed that "things started to take a [bad] turn" because the children were becoming "emotionally dysregulated" after the visits. For example, S.W. expressed not wanting to be alone with father because she did not "feel safe" in his presence.

Considering the children's reactions and their counselors' recommendations, the Department "paused" the in-person visitations and later moved to virtual visits. The Department also ensured that the children continued to receive individual counseling and referred the entire family to functional family therapy. The family participated in three functional family therapy sessions, but father only attended the first two sessions because of a schedule conflict. The sessions

stopped because Z.W., who was 17 years old at the time, had "thoughts of self harm and suicidal thoughts."

In addition to visiting the children, father completed a psychological and parental capacity evaluation with Dr. Klaire Mundy in March 2021. Dr. Mundy reported that father presented "a pattern of . . . paranoid thought and conspiracy." Father told Dr. Mundy that there were people in the community who were spreading "a lot of lies" and "attempting to . . . brainwash him and his children." Considering father's paranoia and his tendency "to view himself as superior," Dr. Mundy doubted that he would change "his thought patterns" or be "psychologically and emotionally available" for his children. Father acknowledged a history of substance abuse, including alcohol, methamphetamine, cocaine, "and a couple of others," but claimed that he was sober. Dr. Mundy opined that father had stopped consuming alcohol "for the time being . . . as a means of complying with the rules that will allow him to regain custody of his children." Questioning whether father had used alcohol "as a means of self-medicating," Dr. Mundy recommended that father meet with a psychiatrist, who could determine whether medication would "get the derealization thoughts, the delusions, the paranoid thoughts back into some sort of . . . control." To best monitor father's "patterns of behavior" and substance use, Dr. Mundy also recommended weekly therapy.

After the evaluation, the Department referred father to a psychiatrist and recommended that he increase his outpatient counseling sessions. Father, however, continued to express concerns about "a community or a conspiracy or a network of individuals trying to influence him and his children." Despite the services, father's paranoia persisted, and he did not make any changes to remedy the conditions that led to, or required the continuation of, the children's placement in foster care. As a result, the JDR court terminated father's parental rights to S.W. and H.W. and approved the foster care goal of adoption. Father appealed the JDR court's rulings to the circuit court.

Before the circuit court trial, father requested four witness subpoenas; three of which were served only by posted service. The fourth subpoena was not served because the witness was no longer employed at the address listed on the subpoena. None of the witnesses appeared at trial. Father requested a continuance, which the circuit court took under advisement until after the Department presented its evidence.

The Department offered evidence about the children and their well-being. S.W. and H.W., who were 14 and 12 years old respectively, were not in the same foster home, but the Department had made efforts to keep them in contact with one another and their siblings. S.W.[5] started counseling with the same therapist as their older sibling, Z.W., in September 2020. According to the therapist, both Z.W. and S.W. were "extremely fearful and concerned for [their] safety" because of father's drinking and "unstable behaviors," such as frequently yelling and screaming and slamming doors. The therapist had recommended "pausing" visitation with father because of the children's "increased emotional distress" following those visits.[6] In January 2022, S.W. was hospitalized because of suicidal thoughts.[7] Following their hospitalization, S.W. was placed in a new foster home, where they were "doing extremely well," according to the Department.

Like his siblings, H.W. participated in counseling, beginning in August 2020. H.W.'s therapist described him as "happy go lucky" at the outset, but H.W. also had expressed "sadness about missing his father," even though he "wouldn't show much affect." As counseling progressed, the therapist realized that H.W. did not understand the confidentiality of the sessions, but once he

---

[5] S.W. uses the pronouns "they/their."

[6] At the time of the circuit court hearing, S.W. was able to have, but rarely had, supervised phone calls with father.

[7] S.W. had been hospitalized twice due to "gender dysphoria issues" and "increasing anxiety about court." S.W.'s second hospitalization occurred in February 2022, when they stayed for "two or three days" for "stabilization."

did, he "became much more vocal . . . and much more expressive."[8] H.W. confessed having "some passive suicidal thoughts," but he did not have an intent or plan. H.W. became "increasingly upset" after visiting with father or talking with him on the phone.[9] At the time of the circuit court hearing, the Department reported that H.W. was "doing wonderful[ly]" but "struggle[d] with anxiety."

The Department explained that it recommended terminating father's parental rights to S.W. and H.W. and a foster care goal of adoption because the children had been in foster care for approximately 25 months and father had not demonstrated that he had progressed as a result of the services offered. The Department emphasized that the children had experienced "significant trauma," which they were "working through," and "it would be detrimental to their progress" to return to father's care. According to the Department, as recently as a few weeks before the hearing, father continued to use "manipulative tactics when talking with his children or discussing concerning suspicions, which really upset his children."

At the close of the Department's evidence, father moved to strike, which the circuit court denied. Father then renewed his continuance request. Finding it important to move the case forward considering how long the children had been in foster care, and noting the Department's objection, the circuit court denied father's motion. However, the circuit court allowed father to proffer "any testimony" that he had "hope[d] to elicit" from the subpoenaed witnesses. The circuit court stated that it would consider father's proffer as substantive evidence. Father proffered that Daniel Kinney was his co-worker and would have testified that father was "of good character and steady in his work" at 7-Eleven. Next, father proffered that Amanda and Michael Chestnut, the children's initial foster parents, would have testified that father had a "good relationship" with the

_____

[8] Around the same time, H.W. switched foster homes and his therapy appointments went from virtual sessions to in-person sessions.

[9] Father continued to have weekly supervised phone calls with H.W. at the time of the circuit court hearing.

children. The Chestnuts would have testified that the children wanted to return home before the Department transferred them to another foster home. The circuit court accepted the proffers, while acknowledging that they deprived the Department and the children's guardian ad litem of their right to cross-examination.

Father testified that the Department removed the children from his care because of alleged neglect but emphasized that the findings were later determined to be unfounded. At the Department's request, father had participated in a substance abuse assessment at Blue Ridge Behavioral Center; he told them that he did not have "a problem" with alcohol, and they allegedly had "no recommendations" for him. Father participated in alcohol and drug screens, which were negative. He also attended AA meetings through December 2021. In addition, after Dr. Mundy's evaluation, father had a one-hour virtual appointment with a psychiatrist. Father told the psychiatrist that he "did not feel the need to take medications" and claimed that the psychiatrist did not recommend or prescribe any medications for him.

Furthermore, father asserted that the children became more "aggressive" and "blamed" him for "everything" after they moved to their second foster home. According to father, "somebody else" was influencing his children. A few months after the children's move, the Department changed the foster care goal from return home to adoption, which "surprised" him. Father expressed his desire for the children to return home so they could feel "protected" and "loved."

At the conclusion of all the evidence, father renewed his motion to strike, which the circuit court denied. After hearing the parties' arguments, the circuit court took the matter under advisement and subsequently issued a letter opinion. The circuit court found that father was "not a credible witness" and his testimony was "contrary to the fact[s]." In addition, the circuit court found that the Department had met its burden of proving that S.W. and H.W. were "subject to abuse and neglect" under Code § 16.1-283(B) and father "failed to remedy the conditions that led to the

placement and continuation of" S.W. and H.W. in foster care under Code § 16.1-283(C)(2). On August 25, 2022, the circuit court entered an order terminating father's parental rights to S.W. and H.W. and approving the foster care goal of adoption for them. Father appeals.

ANALYSIS

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Father argues that the circuit court abused its discretion by denying his continuance request after his subpoenaed witnesses did not appear at trial. "The decision of whether to grant a continuance is committed to the discretion of the circuit court. We will reverse 'a circuit court's ruling on a motion for a continuance . . . only upon a showing of abuse of discretion and resulting prejudice to the movant.'" *Shah v. Shah*, 70 Va. App. 588, 593 (2019) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)). Prejudice "may not be presumed; it must appear from the record." *Cooper v. Commonwealth*, 54 Va. App. 558, 565 (2009) (quoting *Bolden v. Commonwealth*, 49 Va. App. 285, 290 (2007), *aff'd*, 275 Va. 144 (2008)). "Absent a proffer showing 'harm was done,'" the appellate court is "'forbidden [from] consider[ing] the question.'" *Ray v. Commonwealth*, 55 Va. App. 647, 650 (2010) (quoting *Scott v. Commonwealth*, 191 Va. 73, 78-79 (1950)).

The circuit court denied father's continuance request because the children "need[ed] a decision after [25] months in foster care." "[I]t is in the best interests of children to receive a permanent placement without languishing in the foster system." *Simms*, 74 Va. App. at 464. "Given the length of time the case had been ongoing, it was not beyond the pale for the circuit court to believe that even a short continuance had the potential to be harmful to the child[ren] while providing little in the way of benefit to the parties or the court." *Geouge v. Traylor*, 68 Va. App. 343, 375 n.13 (2017).

As noted, the circuit court accepted father's proffer of the witnesses' testimony and treated it as "substantive evidence." The circuit court found that permitting the proffer was the "better decision" because a continuance would not benefit the children.

On appeal, father now asserts that the circuit court's approach was insufficient because his proffer "consisted of a bare summary of the evidence and lacked the flavor and pathos of live testimony." He contends that the ability to present in-person testimony was "critical to bolster his credibility," especially because the circuit court found that he was not a credible witness.

To establish the "necessary prejudice," father must demonstrate that "the decision to deny h[im] a continuance prevented h[im] from presenting h[is] case or otherwise caused h[im] to lose the case." *Geouge*, 68 Va. App. at 374. Father has failed to prove any resulting prejudice from the denial of the continuance because the circuit court accepted the proffers as if the witnesses had testified. Father's credibility argument is wholly speculative. The circuit court had the opportunity to see and hear not only the Department's witnesses but also to observe father's testimony. Considering all the evidence, including father's proffer, the circuit court found that father was not credible. "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." *Sobol v. Sobol*, 74 Va. App. 252, 272 (2022) (quoting

*Anderson v. Anderson*, 29 Va. App. 673, 686 (1999)).  This Court "is bound by" the circuit court's credibility findings.  *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 339 (2013).

The circuit court's "ultimate ruling against [father] was the result of its determination of the facts of the case and not the result of the denial of h[is] continuance request." *Geouge*, 68 Va. App. at 374.  Considering the totality of the circumstances and because father failed to "demonstrate the necessary prejudice," this Court finds the circuit court did not abuse its discretion by denying the requested continuance.  *Id.* at 375.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*