PRESENT: All the Justices

TICONDEROGA FARMS, LLC, ET AL.

v. Record No. 240772

ALEXANDRA B. KNOP, ET AL.

OPINION BY
JUSTICE WESLEY G. RUSSELL, JR.
NOVEMBER 6, 2025

FROM THE COURT OF APPEALS OF VIRGINIA

Ticonderoga Farms, LLC ("Ticonderoga Farms") and its majority member, Peter J. Knop

("Peter"), appeal a decision of the Court of Appeals affirming two circuit court rulings in favor

of Alexandra B. Knop ("Alexandra") and William J.W. Knop ("William"), both individually and

as trustees of the Evergreen Trust[1] (collectively the "minority members"). Specifically,

Ticonderoga Farms and Peter assert that the Court of Appeals erred in affirming the circuit

court's denial of his application for judicial expulsion of the minority members and in granting

the minority members' application for judicial dissolution of Ticonderoga Farms. For the

following reasons, we affirm the judgment of the Court of Appeals.

## I. BACKGROUND[2]

Ticonderoga Farms is a family-owned farming and agritourism business that owns over

900 acres of real property in Northern Virginia. Portions of the property have been in the Knop

family for four generations. In 1982, Peter formed Ticonderoga Farms, Inc., a Virginia

---

[1] Alexandra, William, and Peter R.Q. Knop ("Peter R.Q.") are siblings and the children of Peter. Alexandra and William are minority members of Ticonderoga Farms, and the Evergreen Trust holds Peter R.Q.'s minority interest in Ticonderoga Farms.

[2] Portions of the record below were sealed by the circuit court. "To the extent that we mention facts found only in the sealed record, we unseal only those specific facts, finding them relevant to our decision in this case. The remainder of the previously sealed record remains sealed." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 560 n.3 (2016).

corporation, to manage the business of the farm. Over the years, Peter gifted shares in the corporation to his now-adult children.

Despite (or perhaps because of) the fact that Ticonderoga Farms has been family owned, its operation has led to much strife between its owners for more than a decade. In 2011, although prior tax filings indicated that each of the children owned slightly more than 14% of Ticonderoga Farms, Inc., Peter declared that each child's ownership interest was less than 10%. Faced with the discrepancy, Mario Oriana-Ambrosini, a family friend and lawyer who was then a trustee of the Evergreen Trust,[3] objected, raising the issue with the corporate accountant and writing to Peter that

> in the absence of any explanation, justification or documentation, any departure from the share allocation previously and consistently on record, including the tax records, is erroneous, wrongful and illegal, and, therefore, on behalf of the Evergreen Trust and the other two trustees I am duty bound to object to it.

Oriana-Ambrosini's objection angered Peter. He responded that he was "totally shocked, furious and close to breaking off any and all contact with" Oriana-Ambrosini. Peter continued by noting that, if Oriana-Ambrosini's objection caused issues with the accountant, Peter would "sue [Oriana-Ambrosini] and the trust for intentionally trying to wreck everything I stand for, live for and have done and *will pursue this to my dying breath, irrespective of the financial cost*[.]" (Emphasis added). Unfortunately, Peter's words were prescient as acrimony and litigation among the members of Ticonderoga Farms has proven to be the rule rather than the exception for the last decade.

---

[3] Oriana-Ambrosini died in 2014, leaving Alexandra and William as the only trustees of the Evergreen Trust.

In 2015, Peter converted Ticonderoga Farms, Inc. into a limited liability company. The shareholders in Ticonderoga Farms, Inc. received membership interests in the newly created limited liability company commensurate with the shares Peter determined that they owned in Ticonderoga Farms, Inc. The minority members sued Peter and Ticonderoga Farms over the conversion, seeking a declaration that, consistent with the prior tax filings, each owned a 14.687% share of the company as opposed to the 9.08% that Peter claimed they owned (hereinafter the "Stock Case"). The circuit court ruled in favor of Peter.

Later that year, Peter, through Ticonderoga Farms, sued Peter R.Q. and the trustees of the Evergreen Trust over a parcel of land known as the "Beaverdam Property." Peter claimed the deed Peter R.Q. recorded regarding the property in 2000 was void *ab initio*. The circuit court dismissed the case as untimely.

In 2016, 2017, and 2018, the disputes among the members of Ticonderoga Farms or entities that they controlled compounded. Peter, as managing member of Ticonderoga Farms, sued William and Peter R.Q. over an alleged breach of an oral lease agreement. The minority members filed two suits against Peter over the ownership of various parcels of land. Peter and/or Ticonderoga Farms, by Peter as the managing member, filed three suits (one against each minority member) for trespass and nuisance; two suits for adverse possession; and one suit claiming libel, abuse of process, tortious interference with company business, civil conspiracy, statutory conspiracy, malicious prosecution, insulting words, and defamation. Lastly, Peter R.Q. and Alexandra, as Trustee, sued Ticonderoga Farms over a deed of correction that had been recorded regarding the Beaverdam Property.

In June 2020, the minority members filed a complaint that is the genesis of this appeal. Earlier that month, Peter had issued a notice of a capital call demanding that each member

3

contribute a pro rata share of $5,500,000 to Ticonderoga Farms. Peter claimed that Ticonderoga

Farms was in financial distress and that he had already loaned it over four million dollars. In

their complaint, the minority members sought a declaratory judgment that Peter lacked

"authority to make a capital call or require Plaintiffs to contribute cash to" Ticonderoga Farms

and an order requiring Peter to provide them full and complete access to the books and records of

Ticonderoga Farms as provided for in Code § 13.1-1028.

Ticonderoga Farms and Peter filed an answer, and Peter filed a counterclaim seeking

judicial expulsion of the minority members pursuant to Code § 13.1-1040.1. In addition to

noting that the minority members had refused to pay the capital call and complaining about the

minority members' insistence on seeing corporate documents and financial records, Peter alleged

that suits between the parties had "render[ed] any meaningful operational activity . . . relating to

the LLC impossible." He further alleged that the actions of the minority members "resulted in

the LLC being left with no alternatives because it cannot proceed to operate its business

activities[.]" He concluded by asserting that the minority members had "engaged in concerted

conduct making it not reasonably practicable for the LLC to conduct business with the

involvement of these members[,]" and thus, judicial expulsion of the minority members was

appropriate.

In response to the counterclaim, the minority members filed an amended complaint. In

addition to seeking the relief originally requested, the minority members sought judicial

dissolution of Ticonderoga Farms pursuant to Code § 13.1-1047. Although disagreeing with

Peter regarding who was to blame, the minority members agreed with his conclusion that

Ticonderoga Farms "cannot proceed to operate its business activities." Accordingly, the

minority members, citing Code § 13.1-1047, asserted that "it [wa]s not reasonably practicable to

4

carry on the business" of Ticonderoga Farms, sought judicial dissolution of Ticonderoga Farms, and requested that the circuit court "appoint a third-party liquidating trustee under Virginia Code § 13.1-1048 to wind up the affairs of Ticonderoga Farms, LLC."

The circuit court conducted a three-day bench trial. It heard from numerous witnesses over the three days, including lengthy testimony from both Alexandra and Peter. The basic thrust of the parties' respective presentations was that there had been a complete breakdown in the functioning of Ticonderoga Farms due to the strife among its members that rendered it reasonably impracticable for the business to continue in its current form. Each side of the dispute blamed the other side for that breakdown. When asked specifically whether he could "stay in business with [the minority members] and treat them appropriately" going forward, Peter responded "no, the answer is no, I do not think I can do so."

To support the reasonableness of their request for records and their claim that Ticonderoga Farms was not functioning appropriately, the minority members called a certified public accountant to testify as an expert witness in accounting, forensic accounting, and business valuation. He reviewed Ticonderoga Farms' business and financial records and found "significant red flags" leading him "to conclude that the financial statements are unreliable and that they contain inaccuracies and lack transparency." Specifically, the CPA testified that, for the years 2016 through 2020, the company's financial statements were inconsistent in reporting net income, they overstated Peter's alleged loans and interest by more than a million dollars, they included backdated entries and at least one lump-sum interest calculation for a loan dating back to 1999, and they referenced related entities whose purposes and financial relationships with Ticonderoga Farms were unclear. The expert also concluded that, based on the company's

5

negative annual net income since 2016, he had "serious concerns about the ability of th[e] business to sustain its operations going forward."

Having heard the evidence, the circuit court addressed the various arguments and requests for relief raised by the parties. At the outset, the circuit court determined that a purported operating agreement, which Peter had unilaterally drafted and signed when converting Ticonderoga Farms, Inc. into a limited liability company, was invalid and did not govern the company. The circuit court expressly rejected Peter's argument that the holding in the Stock Case dictated a finding that the purported operating agreement was valid. Accordingly, the circuit court concluded that there was no operating agreement governing Ticonderoga Farms, meaning that Ticonderoga Farms was governed by the default provisions of the Virginia Limited Liability Company Act, Code § 13.1-1000, *et seq*.

Based on this conclusion, the circuit court determined that Peter had lacked the authority to issue the capital call or otherwise require the minority members to make a cash contribution. The circuit court noted that, in the absence of the articles of organization or an operating agreement providing otherwise, the obligation of a member to contribute to a limited liability company is governed by Code § 13.1-1027. Although that code section requires members "to perform any enforceable promise to contribute cash or property[,]" Code § 13.1-1027(B), the circuit court recognized that, by statute, "[n]o promise by a member to contribute to a limited liability company is enforceable unless set out in a writing signed by the member." Code § 13.1-1027(E). Because the minority members had made no such promise in writing or otherwise, the circuit court granted their motion for a declaratory judgment, declaring that Peter "does not have the authority to make a capital call on" the minority members and that the minority members "are not required or obligated to contribute capital to Ticonderoga Farms[.]"

Turning to the minority members' request for certain records of Ticonderoga Farms, the circuit court noted that such requests are governed by Code § 13.1-1028, which grants a member of a limited liability company the right, upon reasonable demand, to obtain certain records maintained by the company. The circuit court rejected Ticonderoga Farms and Peter's argument that, because at least some of the information had been produced in discovery in the various litigations, Ticonderoga Farms did not need to produce the records. Having done so, the circuit court determined that Code § 13.1-1028 entitled the minority members to the records that they had requested. In explaining why it had so concluded, the circuit court stated that a review of all of the circumstances, including questions regarding the adequacy and accuracy of the records that Ticonderoga Farms had kept, rendered the request reasonable. The circuit court explicitly credited the testimony of the expert accountant called by the minority members, stating that it found his testimony "to be persuasive" and agreeing with his view that the records that Ticonderoga Farms had kept raised questions that needed to be answered and amounted to "red flags" deserving further scrutiny.

Regarding Peter's application for judicial expulsion of the minority members pursuant to Code § 13.1-1040.1, the circuit court noted that Peter sought to expel the minority members under each subsection of Code § 13.1-1040.1(5). The circuit court explained that Code § 13.1-1040.1(5)(a) provides for judicial expulsion of a member when "the member engaged . . . in wrongful conduct that adversely and materially affected the business of the limited liability company[,]" subsection 5(b) provides for expulsion when "the member willfully or persistently committed a material breach of the articles of organization or an operating agreement[,]" and subsection 5(c) provides for expulsion when the "member engaged in conduct relating to the business of the limited liability company which makes it not reasonably practicable to carry on

7

the business with the member[.]" The circuit court then addressed Peter's claims under each subsection.

The circuit court began with the claim under subsection 5(b). It noted that, given its prior finding that there was no operating agreement, the minority members could not have breached an operating agreement. The circuit court observed that no evidence or argument had been advanced to establish that any of the minority members had committed a material breach of the articles of organization. Given that subsection 5(b) requires at least one material breach of either the articles of organization or an operating agreement, the failure of Peter to establish such a material breach defeated his claim for expulsion under subsection 5(b).

The circuit court then rejected Peter's claims under subsection 5(a). It listed all of the conduct that Peter contended constituted wrongful conduct that adversely and materially affected the business of Ticonderoga Farms, including the failure to pay the capital call, the failure to act in accordance with Peter's understanding of the rulings from the Stock Case, ongoing litigation, and the demand for records. The circuit court observed that, assuming without deciding that the described acts and omissions of the minority members had adversely and materially affected Ticonderoga Farms, Peter still had failed to make the requisite showing for judicial expulsion under subsection 5(a). The circuit court concluded that the acts and omissions of the minority members were not "wrongful" as required by subsection 5(a). The circuit court came to this determination after reviewing the totality of the evidence and all of the associated circumstances, going so far as to describe some of the alleged acts and omissions complained of as having "aims that are legitimate and just," serving a "legitimate purpose," and having been undertaken for "legitimate reasons." Given its finding that the acts and omissions of the minority members were

8

not "wrongful," the circuit court concluded that Peter had failed to establish that judicial expulsion of the minority members was appropriate under subsection 5(a).

The circuit court next addressed Peter's arguments seeking judicial expulsion of the minority members pursuant to subsection 5(c). In explaining its application of the language of subsection 5(c) to the facts that it had found, the circuit court noted that it viewed the statute's requirement that a member's conduct "make[] it not reasonably practicable to carry on the business with the member" as "causation language." Thus, the circuit court concluded that, to trigger judicial expulsion of a member, there must be "a nexus between the conduct of [that] member and a resulting reasonable . . . impracticability of carrying on the LLC's business with that member." Based on its review of all of the evidence and the facts it had found, the circuit court concluded that no act or omission of a minority member had made it reasonably impracticable for Ticonderoga Farms to carry on business with any or all of the minority members. At no point in explaining its conclusions regarding subsection 5(c) did the circuit court indicate that the relevant acts or omissions had to be wrongful to support judicial expulsion under subsection 5(c).

Having concluded that Peter had satisfied none of the subsections of Code § 13.1-1040.1(5) regarding judicial expulsion of a member, the circuit court denied Peter's application seeking expulsion of the minority members. It then turned to the minority members' application for judicial dissolution of Ticonderoga Farms pursuant to Code § 13.1-1047.

Code § 13.1-1047(A) provides that "the circuit court of the locality in which the registered office of the limited liability company is located may decree dissolution of a limited liability company if it is not reasonably practicable to carry on the business" of that limited liability company. The circuit court recognized that this is "an exacting standard," but that the

9

phrase "not reasonably practicable to carry on the business" did not require a finding that an "LLC is impossible to operate."

Applying the standard to the facts it had found, the circuit court observed that both parties had asserted that it was not reasonably practicable for Ticonderoga Farms to carry on its business. The minority members had done so in seeking judicial dissolution, and Peter had asserted the same in "building the[] case for" judicial expulsion of the minority members. The circuit court noted that Peter had "paint[ed] a picture of an LLC that cannot function as it's currently constituted." It stated that Peter had made clear that, in his view, Ticonderoga Farms was in "gridlock" and suffered from "a lack of action and progress" that was attributable to a general "breakdown in trust[.]"

Based on its review of all of the evidence, the circuit court essentially agreed with the parties that it was not reasonably practicable for Ticonderoga Farms to carry on its business as it was constituted. In doing so, the circuit court reiterated its earlier findings that no actions of the minority members were wrongful and that the actions of the minority members were not the cause of the impracticability of operating Ticonderoga Farms. The circuit court ordered dissolution of Ticonderoga Farms and appointed a trustee to oversee the dissolution.

Ticonderoga Farms and Peter appealed to the Court of Appeals. In an unpublished decision, a divided three-judge panel affirmed the judgment of the circuit court. *Ticonderoga Farms, LLC v. Knop*, Record No. 1590-22-4, 2024 Va. App. LEXIS 325 (June 11, 2024). The majority opined that the circuit court's determinations concerning judicial expulsion and dissolution were owed deference and could not be set aside unless plainly wrong or without evidence to support them. *Id.* at *5, 11-12, 16-17. Finding that there was ample evidence to support the circuit court's conclusions, the majority affirmed. *Id.* at *17.

The dissent, substituting its judgment for that of the circuit court, concluded that the acts or omissions of the minority members were the cause of the impracticability of Ticonderoga Farms conducting business. *Id.* at *20-22. From this conclusion, the dissent opined that the circuit court should have expelled the minority members and, having done so, should not have ordered dissolution of Ticonderoga Farms. *Id.* at *23-28.

Ticonderoga Farms and Peter now appeal to this Court. In doing so, they challenge the lower courts' determination that Code § 13.1-1040.1(5)(c) did not require expulsion of the minority members and the lower courts' determination that judicial dissolution of Ticonderoga Farms was permissible under Code § 13.1-1047.

## II. ANALYSIS

### A. Standard of review

On appeal, Peter contends that the circuit court erred in declining to expel the minority members from Ticonderoga Farms pursuant to Code § 13.1-1040.1(5)(c) and in dissolving Ticonderoga Farms pursuant to Code § 13.1-1047. The circuit court reached its conclusions on these questions after conducting a multi-day trial where evidence was taken. Therefore, its conclusions are "entitled to the same weight as a jury verdict." *Dunbar Group, LLC v. Tignor*, 267 Va. 361, 366-67 (2004). As a result, we owe deference to the circuit court's determinations and will not set them aside "unless they are plainly wrong or without evidence to support them." *Id.* at 367. In conducting our review, we must "consider the evidence relating to" both the expulsion and "dissolution determination[s] in the light most favorable to" the minority members because they prevailed on those questions in the circuit court. *Id.* Such a view of the evidence necessarily requires that we "disregard any [of Peter's] evidence that conflicts with [the]

11

evidence" offered by the minority members.[4] *Geouge v. Traylor*, 68 Va. App. 343, 347 (2017) (citing *Garst v. Obenchain*, 196 Va. 664, 668 (1955)). If, when the evidence is viewed in this light, any rational factfinder could have concluded as the circuit court did regarding expulsion and dissolution, we must affirm the circuit court's judgment.

B. The Virginia Limited Liability Company Act, judicial expulsion, and judicial dissolution

Since Peter's conversion of Ticonderoga Farms, Inc. to a limited liability company in 2015, Ticonderoga Farms has been subject to the Virginia Limited Liability Company Act, Code § 13.1-1000, *et seq.* (the "Act"). In addition to authorizing the formation of limited liability companies in Virginia, the Act provides for default operating procedures and powers for limited liability companies. Many of these provisions contain the caveat that the default provisions provided for in the Act apply unless either the articles of organization or a valid operating agreement provide otherwise.[5] Given the circuit court's finding that Ticonderoga Farms lacks an operating agreement and the fact that no party has suggested that a provision of the articles of organization departs in a material way from the default provisions of the Act, the issues upon which this appeal rests are subject to the default provisions of the Act.

After setting forth the default powers of a properly formed limited liability company, Code § 13.1-1009, the default provisions of the Act also place certain duties upon limited liability companies and those who run them. Pertinent here, Code § 13.1-1028 provides that a

---

[4] During oral argument in this Court, Peter identified evidence he offered below that, if credited by the factfinder, could have led a rational factfinder to conclude that the actions of the minority members rendered it reasonably impracticable for Ticonderoga Farms to conduct its business or that Ticonderoga Farms could continue to operate with him in control. Given our well-established standard of review on appeal, we must assume that, absent an express factual finding to the contrary, the circuit court did not credit such evidence.

[5] *See*, *e.g.*, Code §§ 13.1-1009, 13.1-1019, 13.1-1022, 13.1-1026, 13.1-1027, 13.1-1029, and 13.1-1030.

limited liability company must maintain certain records and make them available to the members of the limited liability company. Specifically, Code § 13.1-1028(A) requires that a limited liability company must either maintain "at its principal office" or "provide each member" of the limited liability company access to electronic copies of specified records, including, but not limited to, a current list of members, organizational documents, the last three years of tax returns, the last three years of financial statements, and a statement identifying events which would cause the dissolution of the limited liability company.

In addition to requiring that members of the limited liability company be given access to the records specified in Code § 13.1-1028(A), the Act further provides that, "upon reasonable request," a member of a limited liability company is entitled to "[o]btain" from the limited liability company

> (i) true and full information regarding the state of the business and financial condition of the limited liability company, (ii) promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year, and (iii) other information regarding the affairs of the limited liability company, except to the extent the information demanded is unreasonable or otherwise improper under the circumstances.

Code § 13.1-1028(B)(2).[6]

---

[6] As with many provisions of the Act, a limited liability company may avoid the requirements of Code §§ 13.1-1028(A) & (B). Code § 13.1-1028(C) provides that

> [n]otwithstanding the provisions of subsections A and B, the rights of a member to obtain information as provided in such subsections may be restricted in writing in an original operating agreement or any subsequent written amendment to an operating agreement approved or adopted by all of the members and in compliance with any applicable requirements of the operating agreement.

The members of Ticonderoga Farms adopted no such restrictions, and thus, Ticonderoga Farms is subject to the requirements set out in Code §§ 13.1-1028 (A) & (B).

The Act also contains provisions to address scenarios in which a limited liability company has ceased to operate properly. Specifically, the Act provides for the circumstances when a member or members of a limited liability company may be judicially expelled and when a limited liability company may be judicially dissolved.

1. Judicial expulsion

Judicial expulsion of a member or members of a limited liability company is governed by Code § 13.1-1040.1(5).[7] Upon an application filed either by the limited liability company or one of its members, a circuit court may expel a member of a limited liability company if it finds that "[t]he member engaged in wrongful conduct that adversely and materially affected the business of the limited liability company[,]" Code § 13.1-1040.1(5)(a), "[t]he member willfully or persistently committed a material breach of the articles of organization or an operating agreement[,]" Code § 13.1-1040.1(5)(b), or "[t]he member engaged in conduct relating to the business of the limited liability company which makes it not reasonably practicable to carry on the business with the member[.]" Code § 13.1-1040.1(5)(c).

Although Peter sought expulsion of the minority members under each of Code § 13.1-1040.1(5)'s subsections, he did not appeal the circuit court's denial of his application under Code § 13.1-1040.1(5)(a) or Code § 13.1-1040.1(5)(b). As those issues have been resolved and are not subject to this appeal, our focus is on Code § 13.1-1040.1(5)(c).

_____

[7] When a member of a limited liability company is judicially expelled, the member does not lose all of his or her interest in the limited liability company. A judicially expelled member "shall continue to hold a membership interest and shall have the same rights that an assignee of the membership interest would have under subsection A of § 13.1-1039." Code § 13.1-1040.2(A). In turn, Code § 13.1-1039(A) provides that an assignee is not entitled "to participate in the management and affairs of the limited liability company[,]" but is entitled "to receive, to the extent assigned, only any share of profits and losses and distributions to which the assignor would be entitled."

14

Consistent with our obligation to "[a]fford[] the words chosen by the General Assembly their plain and ordinary meanings," *Geico Advantage Ins. Co. v. Miles*, 301 Va. 448, 456 (2022), it becomes clear that the circuit court correctly determined that subsection (5)(c) contains a causation requirement. A member of a limited liability company may be expelled only if his or her conduct related to the operations of the company "makes it not reasonably practicable to carry on the business with the member[.]" Code § 13.1-1040.1(5)(c). In this context, the relevant dictionary definitions of "makes" include "to bring about . . . to cause to happen . . . to cause to exist, occur or appear . . . bring to pass[.]" Webster's Third New International Dictionary 1363 (2002). Thus, the conduct of the member facing expulsion must cause or bring to pass a situation in which it is no longer "reasonably practicable to carry on the business with the member." Code § 13.1-1040.1(5)(c).

Furthermore, we conclude that, by choosing the word "makes" instead of well-known legal phrases such as "a proximate cause," the General Assembly conveyed that the member's conduct must be a direct cause of the impracticability of conducting the company's business as opposed to a relatively innocent link in a causal chain.[8] For example, absent something more, a member exercising the statutory right to see the company's records pursuant to Code § 13.1-1028 will rarely, if ever, be sufficient conduct to cause it to be impracticable for the company to carry on business with the member, and thus, merit expulsion of the member. This

---

[8] In so concluding, we do not foreclose the possibility that a series of behaviors by a member, none of which alone are sufficient to render it reasonably impracticable to conduct the business of the company, may combine to "make[] it not reasonably practicable to carry on the business with the member[,]" Code § 13.1-1040.1(5)(c), and thus, subject the member to expulsion.

15

is so even if the demand for records engenders an unreasonable response from the company that, in turn, renders it reasonably impracticable to carry on the business of the company.[9]

2. Judicial dissolution

Judicial dissolution of a limited liability company is governed by Code § 13.1-1047. Code § 13.1-1047(A) provides that a circuit court "may decree dissolution of a limited liability company if it is not reasonably practicable to carry on the business" of the limited liability company. If a circuit court dissolves a limited liability company, it may appoint a trustee to wind up the affairs of the company, Code § 13.1-1048(B), and perform, "in the name and on behalf of the limited liability company," the functions necessary to wind up the company's affairs. Code § 13.1-1048(C).

Unlike with judicial expulsion of a member of a limited liability company under Code § 13.1-1040.1(5)(c), judicial dissolution of a limited liability company is not focused on who caused the impracticability of conducting company business, but rather, on simply whether "it is not reasonably practicable to carry on the business" of the limited liability company. Code § 13.1-1047(A). If, at the time the circuit court makes its determination, the "present

---

[9] Peter notes that, unlike subsection 5(a), which requires that the conduct of the member to be expelled be "wrongful," subsection 5(c) contains no such wrongfulness requirement. We agree with Peter that the General Assembly's inclusion of "wrongful" in subsection 5(a) and its omission of "wrongful" from subsection 5(c) leads to the conclusion that it intended the subsections to cover different, even if occasionally overlapping, conduct. *See Stoots v. Marion Life Saving Crew, Inc.*, 300 Va. 354, 365-66 (2021) (recognizing that, in such a scenario, "we must presume that the General Assembly intentionally excluded [the omitted] language," and thus, intended a different meaning). Accordingly, conduct need not be wrongful to justify judicial expulsion under subsection 5(c); however, such conduct still must be the direct cause of the reasonable impracticability of conducting the company's business with the member. Although not dispositive, whether the challenged member's conduct is wrongful is a factor that a circuit court may consider in determining whether the member's conduct, as opposed to the company's reaction to that conduct or some other circumstance, is the direct cause of the reasonable impracticability of conducting the company's business.

16

circumstances show that it is not reasonably practicable to carry on the company's business[,]" the circuit court "may . . . order a dissolution of the company." *Dunbar Group*, 267 Va. at 367.

Thus, the question becomes what the phrase "not reasonably practicable to carry on the business" means.[10] The circuit court correctly noted that the statutory language sets "an exacting standard," but does not require a finding that a limited liability company "is impossible to operate." If the General Assembly had intended to set the bar at it being impossible for the company to conduct business, it would have said so; by utilizing the phrase "reasonably practicable" instead, it chose a lesser standard. This is true even if "practicable" can be read as meaning "possible," *see* Webster's Third New International Dictionary 1780 (2002) (defining "practicable" as "possible to practice or perform . . . capable of being put into practice"), because the modifier "reasonably" would mean nothing if we did not conclude that its inclusion indicates something less than an absolute inability of the company to function.

Our conclusion that "not reasonably practicable" means something less than impossible should not be read as rendering the statutory standard easy to satisfy. We have held that the standard "is a strict one." *Dunbar Group*, 267 Va. at 367. If the company's core business can be conducted without undue interference or distraction—with the statutory or other rights of both the minority and majority members being observed and protected—the standard will not be met. It is not met by merely demonstrating disagreements among the members of a limited liability

---

[10] We note that the General Assembly chose to use the same phrase, "not reasonably practicable to carry on the business," in both Code § 13.1-1040.1(5)(c) and Code § 13.1-1047(A). "It is a common canon of statutory construction that when the legislature uses the same term in separate statutes, that term has the same meaning in each unless the General Assembly indicates to the contrary." *Commonwealth v. Jackson*, 276 Va. 184, 194 (2008). This is especially true when the separate statutes are part of the same act, in this case, the Virginia Limited Liability Company Act, Code § 13.1-1000, *et seq*. Accordingly, our interpretation of the phrase "not reasonably practicable to carry on the business" as used in Code § 13.1-1047(A) applies with equal force to the meaning of that phrase as used in Code § 13.1-1040.1(5)(c).

17

company over particular decisions or the best way to manage the day-to-day operations of the company. Such routine disagreements fall within the range of normal business operations and are to be resolved by voting mechanisms set forth in an operating agreement or under the default provisions of the Act.

Likewise, the standard is not met by merely demonstrating that litigation was necessary to protect the rights of either the company or any of its members. Isolated litigation between the members of a limited liability company can be resolved by courts without preventing the proper functioning of the company. Only when litigation is so devastating that its distracting effect or the acrimony it engenders actually causes the company to cease to properly function can a court conclude that the high bar set by the statute has been met due to litigation.

It will be the unusual case where the level of dysfunction is such that a company loses the practical ability to conduct its core business functions while observing the rights of its members. Only in such extreme cases will a court be justified in finding that it is "not reasonably practicable to carry on the business" of the company, triggering the court's power to expel a member of the limited liability company pursuant to Code § 13.1-1040.1(5)(c) or to dissolve the company pursuant to Code § 13.1-1047.

C. Evidence supports the circuit court's determination regarding judicial expulsion

Peter argues that the circuit court erred in concluding that judicial expulsion of the minority members was not warranted. He notes that neither party disagrees with the premise that, as constituted at the time of the trial, the parties' "disputes, lack of trust, and bad feelings ma[d]e it no longer practicable for the LLC under current management to do business[.]" He reasons that, because the disputes, the lack of trust, and the bad feelings are mutual, the conduct of the minority members definitionally was a cause of the dysfunction. We disagree.

18

Although it is true that disagreements and litigation require two sides, it does not necessarily follow that the conduct of both sides is the cause of the disputes and any resulting dysfunction. As noted above, it may be that the actions of one side of a dispute are the conduct that, in the language of Code § 13.1-1040.1(5)(c), "makes it not reasonably practicable to carry on the business with the member[.]" Alternatively, there may be some other cause of the dysfunction that is not tied to the conduct of the challenged member or members. The facts underlying this litigation amply support the circuit court's conclusion that the conduct of the minority members was not the direct cause of the dysfunction of Ticonderoga Farms.[11]

This litigation stems from Peter issuing a capital call demanding that the minority members collectively pay more than $1,000,000 to Ticonderoga Farms. Believing that such a demand was *ultra vires* and questioning how the company could have such a need, the minority members both objected to the capital call and requested to see the financial records of Ticonderoga Farms that would establish such a need. The minority members turned to the courts in this case only after Peter continued to insist that the capital call was valid and refused to provide the documents that the minority members had requested.

Although there may be situations where members of a limited liability company engaging in litigation against the company and its management may give rise to expulsion of the member pursuant to Code § 13.1-1040.1(5)(c), any such determination will depend heavily on the circumstances and context. In the instant litigation, the minority members not only asserted good faith claims regarding both the capital call and their demand to see the requested documents, but

---

[11] As he did below, Peter asserts that the minority members initiating the underlying lawsuit is at least part of the conduct of the minority members that renders Ticonderoga Farms incapable of operation, listing the filing of "lawsuits challenging the formation, governance, and management of" Ticonderoga Farms as such conduct.

19

also wholly prevailed on those issues. In rulings that neither Ticonderoga Farms nor Peter challenge, the circuit court concluded that, pursuant to Code § 13.1-1027, the minority members were under no obligation to pay the sums demanded of them by Peter, and that, pursuant to Code § 13.1-1028, the minority members had reasonably demanded documents that they were entitled by statute to see.

Assuming that there may be circumstances under which a minority member insisting on rights guaranteed to him or her by statute might be sufficient cause to allow a circuit court to expel that member pursuant to Code § 13.1-1040.1(5)(c), such a situation does not require expulsion as a matter of law. A circuit court, as factfinder, is free to conclude that merely asserting statutory rights is not the direct cause of any company dysfunction, and therefore, decline to expel the member pursuant to Code § 13.1-1040.1(5)(c). This is especially true in cases, like this one, where the circuit court explicitly credited testimony that raised "red flags" about the financial record keeping of the company, leading it to conclude that the conduct of the minority members, in initiating the litigation and in undertaking the other actions complained of, had "aims that are legitimate and just," served a "legitimate purpose," and was undertaken for "legitimate reasons."

The circuit court's conclusion that the conduct of the minority members did not "make[] it not reasonably practicable to carry on the business" of Ticonderoga Farms, Code § 13.1-1040.1(5)(c), was neither "plainly wrong" nor was it "without evidence to support" it. *Dunbar Group*, 267 Va. at 367. Accordingly, the Court of Appeals correctly affirmed the circuit court's judgment on judicial expulsion.[12]

---

[12] In addition to the issues raised in the instant litigation, Peter also argues that other litigation, such as the Stock Case, and how the minority members conducted themselves regarding other company issues related to the sale of property constituted conduct that required

D. Evidence supports the circuit court's determination regarding judicial dissolution

Peter next contends that the circuit court erred in dissolving the company based on its finding that it was "not reasonably practicable to carry on the business" of Ticonderoga Farms. Code § 13.1-1047(A). He asserts that the circuit court's finding necessarily was in error because he possesses a 72.67% membership interest in Ticonderoga Farms, and this majority interest allows him to control the affairs of the company. Finding that the evidence before the circuit court was more than sufficient to support its conclusion, we disagree with Peter.

Although there is some theoretical appeal to Peter's majority interest argument, the argument fails when it collides with reality, i.e., the evidence heard by the circuit court in this case. After all, Peter held the same 72.67% membership interest at the time of trial and has held a controlling membership interest in Ticonderoga Farms since its creation. Despite his always having a majority controlling interest, the evidence at trial amply supports the circuit court's conclusion that, at the time of trial, the circumstances were such that it was "not reasonably practicable to carry on the business" of Ticonderoga Farms. Code § 13.1-1047(A).

To begin, we note that *all* parties to the case, including *Peter*, pled in the proceedings below that it was not reasonably practicable for Ticonderoga Farms to conduct business as it was constituted. Although he sought to blame others for the dysfunction, Peter maintained below that the circumstances had "render[ed] any meaningful operational activity . . . relating to the LLC impossible[,]" and "resulted in the LLC being left with no alternatives because it cannot proceed

---

their expulsion pursuant to Code § 13.1-1040.1(5)(c). Nothing in the undisputed evidence on these issues, such as the Stock Case, compelled a conclusion by the circuit court that the minority members' conduct was the cause of the company's dysfunction. Furthermore, regarding any disputed evidence concerning the conduct of the minority members and its effects, the standard of review requires us to conclude that the circuit court rejected the evidence that would support expulsion of the minority members. *See Geouge*, 68 Va. App. at 347.

to operate its business activities[.]" He made clear that, so long as the minority members were involved, it was not "reasonably practicable for the LLC to conduct business[.]"

The parties' allegations of complete dysfunction in the operation and the management of Ticonderoga Farms were borne out by the evidence. The evidence before the circuit court painted a picture of a paralyzed company that had ceased to perform even the most basic corporate functions. In addition to all of the operational failings identified by Peter,[13] the evidence established that the company was neither meeting its statutory obligations to its minority members nor was it meeting its obligations regarding record keeping. The circuit court expressly credited the expert accounting testimony that established significant issues with the company's management, operations, record keeping, and continued viability. Accordingly, the circuit court's conclusion that, despite Peter holding a majority interest, it was reasonably impracticable for Ticonderoga Farms to conduct business was neither "plainly wrong" nor was it "without evidence to support" it. *Dunbar Group*, 267 Va. at 367.

Although it was required to make its decision based on the "present circumstances," *id*., we note that the evidence before the circuit court gave little to no hope that there would ever be a circumstance in which the company could function normally or appropriately. After all, Peter had once made clear that he viewed dissent by the minority members as a personal attack that he would fight "to [his] dying breath, irrespective of the financial cost[.]" Even at trial, Peter made clear that he could not now nor in the future cooperate or function with the minority members.

---

[13] Sitting as factfinder, the circuit court was "free to believe or disbelieve, in part or in whole, the testimony of any witness[.]" *Massey v. Commonwealth*, 67 Va. App. 108, 130 (2016) (internal quotation marks and citation omitted); *see also Vasquez v. Commonwealth*, 291 Va. 232, 250-251 (2016). Accordingly, the circuit court could, as it did, credit Peter's testimony regarding the dysfunction while rejecting his testimony suggesting it was the conduct of the minority members that caused that dysfunction.

When asked specifically whether he could "stay in business with [the minority members] and treat them appropriately" going forward, Peter responded "no, the answer is no, I do not think I can do so."

Faced with his own allegations and the evidence at trial, Peter acknowledges in his briefing in this Court that he does not "challenge the circuit court's conclusion that the[] disputes, lack of trust, and bad feelings make it no longer practicable for the LLC under current management to do business" so long as the minority members remain active members. In effect, he argues that, accepting that it was reasonably impracticable for the business to continue as it existed, the circuit court should have expelled the minority members rather than dissolve the company. He asserts that to decide otherwise is to erroneously grant "a trial court carte blanche discretion to pick and choose which statute [Code § 13.1-1040.1 or Code § 13.1-1047] to follow." We disagree.

First, we note that nothing in the text of the Act requires a circuit court to favor judicial expulsion over dissolution. Although circumstances may lead to competing claims of expulsion and dissolution being brought in the same proceeding involving similar or overlapping issues and conduct, the Act does not expressly favor one remedy over the other.

Even assuming the Act favors expulsion over dissolution, the circuit court in this case decided to address Peter's expulsion claims before reaching the dissolution question. Only after it had determined that the conduct of the minority members did not "make[]" it reasonably impracticable to carry on the business with the minority members under Code § 13.1-1040.1(5)(c) did the circuit court turn to the application for dissolution pursuant to Code § 13.1-1047. Given that the circuit court's ruling on judicial expulsion meant that the minority members would continue as active members, Peter's acknowledgement that the company could

not function as it was currently constituted supports the circuit court's conclusion that dissolution of Ticonderoga Farms was appropriate.

Contrary to Peter's arguments, our decision in *Dunbar Group* does not suggest otherwise. Like this case, the circuit court in *Dunbar Group* was faced with both an application to expel a member of a limited liability company under Code § 13.1-1040.1(5) and an application to dissolve the company under Code § 13.1-1047. 267 Va. at 364-65. The company was a two-member limited liability company with each member holding a 50% membership interest, raising the potential for deadlock when the members disagreed. *Id*. at 363. After a bench trial, the circuit court concluded that the challenged member had engaged in wrongful conduct meriting his expulsion from the company. *Id*. at 365-66.

Although the only reasons that had been offered for the reasonable impracticability of the company to conduct business for the purpose of dissolution were the expelled member's conduct and the fact that his 50% interest could be used to deadlock decision-making, *id*. at 367-68, the circuit court found that it was not reasonably practicable for the company to conduct business and dissolved the company. *Id*. at 366.

We reversed the circuit court's decision on dissolution. We observed that the circuit court had failed to consider the effect the expulsion of the member had on the ability of the company to operate. *Id*. at 367. Because the change in the status quo effectuated by the decision to expel the member had removed any issue with the operation of the company, we held it was error for the circuit court to dissolve the company. *Id*. at 368-69.

Nothing in *Dunbar Group* suggests that judicial expulsion necessarily is preferred to dissolution. Properly understood, *Dunbar Group* requires a circuit court to make its decision regarding dissolution based on "present circumstances." *Id*. at 367. Because the expulsion of a

24

member had altered the status quo, the circuit court in *Dunbar Group* erred in not considering the effect of that change in circumstances. In the instant case, the circuit court's ruling on expulsion did not alter the status quo, but rather, left it in place. Accordingly, there were no changed circumstances for the circuit court to consider in making its dissolution determination, and therefore, the circuit court's decision in this case is consistent with our opinion in *Dunbar Group*.

III. CONCLUSION

As a general matter, the management of a limited liability company is left to its members and any organizational or operating agreements that they craft. Judicial intervention, whether by way of judicial expulsion of a member of the company or by judicial dissolution of the company, is the exception to the general rule and is merited only in the extreme circumstances set out in the statute. Here, the evidence was sufficient to allow the circuit court to determine that judicial expulsion of the minority members pursuant to Code § 13.1-1049.1(5)(c) was not warranted.

Regarding the circuit court's decision to dissolve Ticonderoga Farms pursuant to Code § 13.1-1047(A), we reiterate that the threshold for judicial dissolution of a limited liability company is a high bar that only will be met in extreme cases. The evidence credited by the circuit court in this case was sufficient to support the conclusion that this is such an extreme case. Given the deference owed to the circuit court as factfinder, *Dunbar Group*, 267 Va. at 366-67, the Court of Appeals correctly affirmed the judgment of the circuit court. Accordingly, we affirm the judgment of the Court of Appeals.

*Affirmed*.